IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., a minor by his parent, P.S., and on his own behalf, | ) ) ) | Magistrate Judge Patricia L. Dodge |
| **Plaintiff,** | ) ) ) | No. 2:18-cv-1713 |
| v. | ) ) ) | |
| Keystone Oaks School District, | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

### PLAINTIFFS' MEMORANDUM SUPPORTING THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiffs, J.S., a minor by his parent, P.S., by their attorneys, Kristen C. Weidus, Esq., Toni Haraldsen, Esq., and Ruder Law LLC, commenced this action under the Individuals with Disabilities Education Act, 20 U.S.C. § 1401 *et seq.* (the "IDEA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 504 ("Section 504"). Plaintiffs sought reversal of the finding of the Hearing Officer that J.S. had been provided a free appropriate public education ("FAPE") in the least restrictive environment ("LRE"). Plaintiffs further sought a declaration that the Defendant's actions and omissions violated the IDEA and Section 504, the award of full days of compensatory education for each school day during the period of March 1, 2016 to March 27, 2017, and the award of reasonable attorney's fees and related costs.

For the reasons set forth herein, Plaintiffs respectfully submit that no genuine issue of material fact exists, and their Motion for Summary Judgment should be granted pursuant to Federal Rule of Civil Procedure 56.

### INTRODUCTION AND PROCEDURAL BACKGROUND

On or about March 1, 2018, Plaintiffs filed a timely request for an administrative Due

Process Hearing with the Office for Dispute Resolution ("ODR"). Plaintiffs' Due Process Complaint alleged, among other claims, that Defendant had denied J.S. a FAPE in the LRE from March 1, 2016 through March 27, 2017.[1]

The Due Process Hearing was held on one day – June 25, 2018. Hearing Officer Michael J. McElligott issued an opinion on September 30, 2018. The Hearing Office found that Defendant provided J.S. FAPE in the LRE over the period of March 2016 through March 2017.

On or about December 28, 2018, Plaintiffs filed the instant action challenging the Hearing Officer's decision in the underlying Due Process Hearing. The Complaint alleged violations of both the IDEA and Section 504. On February 26, 2019, Defendant filed an Answer to Plaintiff's Complaint.

## FACTS

Pursuant to Local Rule 56.1, Plaintiffs have separately filed a Concise Statement of Material Facts ("Facts") setting forth the facts essential for this Court to decide the Motion for Summary Judgment. It is incorporated by reference herein.

## STANDARD OF REVIEW

A court reviewing an administrative action under the IDEA "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2). Therefore, in reviewing a state agency decision under the IDEA, a court does not adopt the traditional summary judgment standard of review. *See Bucks Cnty. Dep't of Mental Health/Mental Retardation v. De Mora*, 227 F. Supp. 2d 426, 428 (E.D. Pa. 2002).

---

[1] Plaintiffs' Due Process Complaint also included a claim alleging that Defendant had denied J.S. FAPE from March 28, 2017 through October 13, 2017. Plaintiffs withdrew that claim prior to the Due Process Hearing.

The Third Circuit has explained that district courts are to give "due weight" to the factual findings of the Hearing Officer in IDEA cases. *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "A federal district court reviewing the administrative fact finder in the first instance is . . . required to defer to the [Administrative Law Judge]'s factual findings unless it can point to contrary nontestimonial extrinsic evidence on the record." *Id*. at 270.

## ARGUMENT

I. **The Hearing Officer Failed to Apply the *Oberti* Standard in Determining Whether the School District Provided a Free Appropriate Public Education in the Least Restrictive Environment**

Under the IDEA, states must establish:

> procedures to assure that, to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily . . . .

20 U.S.C. § 1412(5)(B). In other words, the IDEA "requires participating States to educate handicapped children with nonhandicapped children whenever possible." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 202 (1982).

Section 504 of the Rehabilitation Act of 1973 contains a similar mandate. It provides that school districts must "educate . . . each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person." 34 C.F.R. § 100.34(a). Furthermore, schools "shall place a handicapped person in the regular educational environment operated by the recipient unless the District can prove that it is impossible to do so with additional accommodations and assistance." *Id*.

In *Oberti v. Board of Education of Borough of Clementon School District*, the Third Circuit adopted a two-part test to determine whether a school is in compliance with this

3

mainstreaming requirement. 995 F.2d 1204, 1215 (3d Cir. 1993). First, the court must determine "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Id*. (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). Second, if the court determines that placement outside of the regular classroom is necessary for the child's educational benefit, the court must then decide "whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id*. (quoting *Daniel R.R.*, 874 F.2d at 1048).

As an initial matter, Plaintiffs do not challenge the underlying factual findings of the Hearing Officer's decision. Rather, Plaintiffs challenge the Hearing Officer's application of the law to those findings.

    a.    <u>The Hearing Officer failed to apply the *Oberti* standard, instead relying on the alleged severity of J.S.'s diagnosis and his behaviors.</u>

In the underlying decision, the Hearing Officer cited *Oberti* once – to define the LRE mandate enshrined in the IDEA. (Facts ¶ 63). At no point did the Hearing Officer outline the two-part test to apply when determining whether a placement is the least restrictive environment for a student. (Facts ¶ 64). There was no analysis of the steps the District took to provide supplementary aids and services to J.S. in the regular education classroom, nor whether the District made efforts to include J.S. in school programs with his nondisabled peers. (Facts ¶ 65). Instead, the Hearing Officer outlined a chronology of facts and held that "on this record and under these facts, the District met its obligations to the student." (Facts ¶ 65). In this way, the Hearing Officer made a significant error of law, effectively ignoring well-established case law in favor of application of irrelevant facts. As *Oberti* makes clear, school districts are required to take specific steps prior to moving students with disabilities to more restrictive settings. *See Oberti*, 995 F.2d at 1215. Defendant in the instant case failed to appropriately analyze the established factors, and the Hearing Officer erred in doing the same.

      b.      <u>Defendant failed to consider whether J.S. could be educated in the regular classroom with supplemental aids and services.</u>

The Third Circuit has explained that, in determining whether a child with disabilities can be educated in the regular classroom with supplemental aids and services, the court should consider several factors, including: "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Oberti*, 995 F.2d at 1217-18.

      i.      *Defendant failed to give serious consideration to including J.S. in the regular classroom with supplementary aids and services.*

IDEA regulations require school districts to provide "a continuum of placements . . . to meet the needs of handicapped children." 34 C.F.R. § 300.551(a). This continuum must "[m]ake provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement." *Id*. § 300.551(b). The school "must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disability." *Oberti*, 995 F.2d at 1216 (citation removed) (quotation removed). Furthermore, "mere token gestures" do not satisfy this requirement. *Id*.

In *A.G. ex rel. S.G. v. Wissahickon School District*, the Third Circuit determined that a school district had made reasonable efforts to accommodate the student in the regular classroom. 2010 WL 1173017 at *2 (3d. Cir. March 29, 2010) (unpublished). The student had an intellectual disability, was non-speaking, had vision needs, and had adaptive skill deficits. *Id*. at

5

*1. The Third Circuit explained that the school district had provided the following supplementary aids and services: (1) modification of curriculum and materials; (2) modification of assignments; (3) a one-on-one aide; (4) additional interaction with the general education teacher; (5) small group and one-on-one instruction; (6) consultation between the special education teacher and the regular education teachers; (7) adapted equipment; and (8) significant parent-teacher communication. *Id*. at *2. It determined that these supports and services established that the school district had provided substantial support in the form of supplementary aids and services. *Id*.

Furthermore, in *H.L. v. Downingtown Area School District*, the Third Circuit upheld a district court's determination that a school district had denied a student FAPE in the LRE. 624 Fed. Appx. 64, 68-70 (3d Cir. 2015) (unpublished). The Third Circuit based its decision on the lack of evidence within the Individualized Education Plan ("IEP") and Notice of Recommended Educational Placement ("NOREP") as to the District's consideration of the continuum of possible placements. *Id*. The IEP did not address why inclusion on the same scale as the parents' preferred placement was not appropriate or why the SDI proposed could not be implemented in the regular classroom. *Id*. at 69. Additionally, the NOREP only included one line rejecting full inclusion as not appropriate for the student's needs. *Id*. The Third Circuit held that this "was clearly insufficient" and the parents had "shown that it was more likely than not that the District failed to consider the 'whole range' or 'continuum' of possible placements as mandated by the IDEA." *Id*.

Here, the District made no reasonable efforts to accommodate J.S. in the regular classroom. At the time of the placement decision, J.S.'s IEP included the following specially designed instruction ("SDI"): (1) provision of class note copies; (2) use of a computer to type classwork or homework; (3) verbal responses to questions if computer not available;

6

(4) reduction of written assignments; (5) adaptation of paper; (6) large graph paper for math; (7) highlighting of areas where answers were to be provided on worksheets; (8) meetings with teachers to review writing demands of each course; (9) preferential seating; (10) prompting and praise; (11) use of planner and folder system; (12) check-in and check-out with special education teacher for homework completion; (13) testing in a quiet place; (14) increased time to respond verbally; (15) adapted tests; (16) extended time; and (17) opportunities to use time outs to meet with a mental health therapist. (Facts ¶¶ 9, 36-37). Notably, only one of these SDI was added following J.S.'s behavioral incidents in Fall 2016 – opportunities to use time outs to meet with a mental health therapist. (Facts ¶¶ 36-37). This SDI (and the changes made to J.S.'s schedule that were not found in the IEP) was viewed as a temporary change – the very type of token gesture envisioned by *Oberti*. *See Oberti*, 995 F.2d at 1216; (Facts ¶ 43). Further evidence that these changes were mere token gestures is found in the Director of Special Education's action of faxing a referral form to the outside placement on the same day as the meeting. (Facts ¶ 34). In other words, there was no intent to see how these changes could impact J.S.'s behaviors.

Furthermore, the principal testified that the intent was for J.S. to go to another program and leave Defendant's school. (Facts ¶ 39). Unlike the school district in *A.G.*, Defendant's SDI did not provide substantial support in the areas of need relevant to Defendant's placement decision – behavioral and emotional needs. *See A.G.*, 2010 WL 1173017 at *2. Instead, these supports and services were focused on the academic needs identified when J.S. was first evaluated by Defendant.

Additionally, the IEP and NOREP show no evidence of the District's consideration of the continuum of placements. At the October 23, 2015 meeting, the District made no revisions as to Section VII, which encompasses the questions regarding educational placement. (Facts ¶ 37). In fact, there was no change to the level of services at that meeting, and J.S.'s IEP continued to

7

provide for itinerant learning support services. (*Id.*). The NOREP indicates that the only other option considered by the District at the time of its placement recommendation was continued special education services in J.S.'s neighborhood school. (Facts ¶ 47). As in *H.L.*, there is no evidence within these two documents to show that the District considered other supplementary aids and services or considered the full continuum of placements prior to issuing the NOREP. *See* 624 Fed. Appx. at 68-70.

> ii. *This Court need not consider the remaining factors because Defendant's failure to seriously consider including J.S. in the regular education classroom establishes that Defendant violated the mainstreaming requirement.*

When a school district has not seriously considered including the child in a regular classroom with these types of services and modifying the regular curriculum as an accommodation, the school district has likely violated the mainstreaming requirement of the IDEA. *Oberti*, 995 F.2d at 1216.

In *H.L.*, the Third Circuit did not consider any factors beyond the first enumerated one when the IEP and NOREP failed to provide any insight into the options the school district considered before it determined the student's placement. 624 Fed. Appx. at 68-69. It explained that "[u]nder these circumstances, it is impossible to assess whether [student] could have been educated satisfactorily in a regular classroom with assistance, or what steps, if any, the District took to accommodate [student] in a classroom." *Id.* at 69.

Because the District did not seriously consider including J.S. in the regular classroom with supplementary aids and services, this Court should end its analysis here and reverse the Hearing Officer's decision determining there was no LRE violation. *See Oberti*, 995 F.2d at 1216; *H.L.*, 624 Fed. Appx. at 68-69.

     iii. *The educational benefits J.S. would receive in a regular classroom could not be replicated in a segregated environment.*

In the alternative, if this Court determines that it is appropriate to consider additional factors, Plaintiffs assert that consideration of these factors also supports their position.

The court should next compare the benefits the child will receive in a regular classroom with supplementary aids and services and the benefits he will receive in a segregated special education classroom. *Oberti*, 995 F.2d at 1216. Importantly, the court "must pay special attention to those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers." *Id.*; *see also Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 697 (11th Cir. 1991) (explaining that language and role modeling from association with nondisabled peers are essential benefits of mainstreaming).

In *A.G. ex rel. S.G. v. Wissahickon School District*, the Third Circuit compared the benefits the student would receive in a regular classroom (with supplementary aids and services) with the benefits in a special education class. 2010 WL 1173017 at *2. It explained that the student made little progress in her academic goals in her mainstreamed courses, had minimal to no interaction with the regular education students in the mainstreamed courses, and made progress on life skills while enrolled in the life skills curriculum. *Id.*

Unlike the student in *A.G.*, J.S. made progress on his academic goals prior to the placement decision and had significant interaction with his nondisabled peers throughout the school day. *See* 2010 WL 1173017 at *2; (Facts ¶ 51). Furthermore, J.S.'s new behaviors of concern at the time of the placement decision were essentially social—his interactions with another student were not appropriate socially and reflected his inability to appropriately navigate relationships with other students. Students with social skills deficits like J.S. are the very students contemplated by the Third Circuit in *Oberti* as obtaining unique benefits from inclusion

9

in the general education classroom.  *See Oberti*, 995 F.2d at 1216.  These benefits could not be replicated in a segregated special education placement.

      iv. *With appropriate supplementary aids and services, J.S. would not significantly impair the learning of other students.*

  As a third factor, the court should consider the possible negative effect that a child's inclusion may have on the education of other students in the regular classroom.  *Oberti*, 995 F.2d at 1217.  This consideration should include the degree to which the child may disrupt the class and whether the child's disabilities would require so much of the teacher's time that the teacher would need to ignore the other students.  *Id*.  However, the court must remember the law's requirement of the provision of supplementary aids and services.  *Id*.  "An adequate individualized program with such aids and services may prevent disruption that would otherwise occur." *Id*.

  The Third Circuit explored this factor in *A.G.*, where the student engaged in certain behaviors in the mainstream classroom.  2010 WL 1173017 at *3.  The student engaged in frequent, loud vocalizations that negatively impacted her classmates.  *Id*.  Additionally, other behaviors were distracting to her classmates:  removing her shoes and socks, inappropriately clapping and grinding her teeth, having difficulty toileting, and inappropriately touching other students.  *Id*.

  Here, the behaviors that resulted in J.S.'s placement outside of his neighborhood school were focused toward one other student and did not negatively impact his other classmates.  Unlike the student in *A.G.*, J.S.'s behaviors were not frequent nor consistent in the regular education classroom.  *See A.G.*, 2010 WL 1173017 at *3.  Furthermore, these incidents did not require teachers to spend significant amounts of time with J.S. to the detriment of other students.  Most importantly, Defendant never implemented any behavioral supports in the regular education classroom, nor did it develop a Positive Behavior Support Plan.  Therefore, Defendant

10

cannot use behaviors it failed to address in J.S.'s programming to then support its placement of him in a restrictive setting. *See Oberti*, 995 F.2d at 1217.

In light of the above factors, this Court should determine that J.S. could be educated in the regular education classroom with supplementary aids and services. This Court should reverse the Hearing Officer's decision determining Defendant had not violated the LRE mandate of the IDEA and Section 504.

    c.    <u>Even if J.S. could not be educated in the regular education classroom, Defendant failed to mainstream him to the maximum extent appropriate.</u>

Plaintiffs assert that this Court should determine that Defendant failed to give serious consideration to the full range of supplementary aids and services, and, therefore, this Court need not determine whether Defendant failed to mainstream J.S. to the maximum extent appropriate. However, if this Court determines that J.S. could not be educated in the regular education classroom, Defendant still violated the LRE mandate of the IDEA by excluding J.S. entirely from an interaction with his nondisabled peers during the time period at issue.

When a court determines that a student cannot be educated in the regular education classroom, it then turns to whether the school included the child in school programs with nondisabled children to the "maximum extent appropriate." *Oberti*, 995 F.2d at 1218.

Defendant's placement decision resulted in J.S. receiving no opportunities to be included in school programs with nondisabled children, as it was a full-time emotional support program in an outside placement. (Facts ¶¶ 47-48). Up until Defendant's placement decision, J.S. had been educated entirely in the general education classroom, where he made progress on his IEP goals. (Facts ¶¶ 8, 51). No data indicated that J.S. was unable to participate with his nondisabled peers in non-academic settings such as lunch, electives, or homeroom. Furthermore, as argued above, the behaviors relied on by Defendant in making its placement decision were of a nature that J.S. would benefit from interactions with his nondisabled peers to model and develop appropriate

social skills. Therefore, this Court should reverse the Hearing Officer's decision that J.S.'s placement in a restrictive outside placement did not violate the mainstreaming mandate.

        d.    <u>Defendant failed to follow federal regulations and law when placing J.S. in an Approved Private School.</u>

Prior to placing or referring a child with a disability to a private school or facility, the LEA must initiate and conduct a meeting to develop an IEP for the child. 34 C.F.R. § 300.325. In addition, the LEA must ensure participation by a representative from the private school, either by personal appearance or telephone participation. 34 C.F.R. § 300.325(a)(2).

When a school district is unable to provide an appropriate program effectively and efficiently, Approved Private Schools ("APSs"), state schools, and out-of-state institutions should be used only when the school district and immediate unit cannot provide effective and efficient services. 22 Pa. Code § 171.13. A recommendation to one of those educational placements may only be made after the child receives an evaluation. 22 Pa. Code § 171.15. Furthermore, an APS should be considered only as a last resort. 22 Pa. Code § 171.16(c).

Here, Defendant failed to follow federal regulations and state law when it made the recommendation to an APS. First, Defendant failed to develop an IEP for J.S. prior to referral to Wesley Spectrum. *See* 34 C.F.R. § 300.325. The principal testified that the one revision to the IEP made at the October 23, 2015 meeting was temporary. (Facts ¶ 43). The temporary nature of this change, in addition to the fact that there was no change in the level of services in the IEP, establishes that the revised IEP was not one that could be implemented in an APS. Additionally, that meeting was not convened to revise J.S.'s IEP in preparation for the transition to an APS; rather, that meeting was the one where Defendant was to consider the factors to determine whether an APS was even appropriate. Second, no representative from Wesley Spectrum participated in the October 23, 2015 meeting. (Facts ¶ 31); *see* 34 C.F.R. § 300.325(a)(2).

Third, as established above, Defendant failed to seriously consider the continuum of

12

placements in making its placement decision.  As a result, Defendant treated placement at an APS as a first option, rather than a last resort.  Further, it failed to first analyze whether it and the Intermediate Unit could provide appropriate services to J.S. in a less restrictive setting.  *See* 22 Pa. Code § 171.13; 22 Pa. Code § 171.16(c).  Fourth, Defendant failed to conduct a new evaluation targeting J.S.'s behaviors (which were the cause of the placement decision) prior to referral to the APS.  *See* 22 Pa. Code § 171.15.  Therefore, in addition to failing to consider the factors identified in *Oberti* when making its placement decision, Defendant also failed to follow federal regulations and state law establishing the necessary steps school districts must take if a student requires placement in an APS.

## II. The Hearing Officer Improperly Relied on Facts Not Available to Defendant at the Time of Its Placement Decision

The Third Circuit has explained that "[n]either the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993).  It further explained that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." *Id*.

Again, as an initial matter, Plaintiffs do not challenge the Hearing Officer's factual findings.  Rather, Plaintiffs challenge the Hearing Officer's reliance on facts that Defendant testified were not available to it at the time of the placement decision.

Here, the Hearing Officer specifically relied on facts that Defendant testified were not available to it at the time of the placement decision.  The principal and Director of Special Education did not have documentation from Western Psychiatric Institute and Clinic at the time of the meeting wherein placement was determined.  (Facts ¶ 33).  Furthermore, the principal testified that he did not have any contact with the evaluator from Western Psychiatric Institute and Clinic and had no other means to find out information regarding the evaluation other than

13

from Plaintiff P.S. (Facts ¶ 24). His only alleged conversation with P.S. included minimal information from the evaluation – J.S. had shown signs of early psychosis but was not admitted or medicated. (Facts ¶ 25). Despite this testimony, the Hearing Officer listed the following facts in his fact finding which he cited as coming from the additional documentation that he ordered be produced and Defendant testified it did not have access to at the time of the placement decision:

1) J.S.'s conversations with the evaluator at Western Psychiatric Institute and Clinic regarding his emotions;

2) The evaluator's observations regarding J.S.'s demeanor during the evaluation;

3) The specific provisional diagnosis provided in the evaluation as well as the basis for this diagnosis;

4) The recommendations of the evaluator for a follow-up visit; and

5) The treatment plan that resulted from this follow-up visit, including recommendations.

(Facts ¶ 61). Furthermore, the Hearing Officer included these facts in his decision despite also finding that the mental health evaluation was not provided to Defendant and that the only information Defendant had was the information provided by P.S. (Facts ¶ 62).

As the Hearing Officer explicitly found, the information within J.S.'s medical records from Western Psychiatric Institute and Clinic was not available to Defendant at the time of its placement decision. Therefore, the Hearing Officer wrongly considered this information in his decision, essentially engaging in "Monday Morning Quarterbacking." *See Fuhrmann*, 993 F.2d at 1040. Therefore, this Court should reverse the Hearing Officer's decision to the extent that it relied on this information.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court grant summary

14

judgment in their favor.  Plaintiffs request that this Court determine that Defendant failed to provide J.S. a FAPE in the LRE in violation of the IDEA and Section 504.  Plaintiffs further request that this Court remand this matter to the Hearing Officer for the limited purpose of calculating an award of compensatory education in accordance with this Court's decision.

                                          Respectfully submitted,

                                          RUDER LAW, LLC

Date: <u>July 10, 2019</u>                By:    <u>/s/ Kristen C. Weidus</u>
                                                  Kristen C. Weidus, Esq.
                                                  PA I.D. # 313486
                                                  429 Forbes Ave.
                                                  Suite 450
                                                  Pittsburgh, PA 15219
                                                  (412) 281-4959

                                                  <u>/s/ Toni Haraldsen</u>
                                                  Toni Haraldsen, Esq.
                                                  PA I.D. # 318834
                                                  429 Forbes Ave.
                                                  Suite 450
                                                  Pittsburgh, PA 15219
                                                  (412) 281-4959