**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| J.S., a minor by his parent, P.S.,<br>and on his own behalf, | ) | Magistrate Judge Patricia L. Dodge |
| | ) | |
| **Plaintiff,** | ) | No. 2:18-cv-1713 |
| | ) | |
| v. | ) | |
| | ) | |
| Keystone Oaks School District, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### CONCISE STATEMENT OF MATERIAL FACTS

AND NOW COME the Plaintiffs, J.S., a minor by his parent, P.S., by their attorneys,

Kristen C. Weidus, Esq., Toni Haraldsen, Esq., and Ruder Law LLC, and file this Concise

Statement of Material Facts pursuant to Local Rule 56.1.

### FACTS

1.  Plaintiff J.S. is a resident of Pittsburgh, Pennsylvania residing at 421 Hoodridge

    Drive, Pittsburgh, PA 15234.  App. 6 at 44-46.

2.  Plaintiff P.S. is a resident of Pittsburgh, Pennsylvania residing at 421 Hoodridge

    Drive, Pittsburgh, PA 15234.  She is the mother of Plaintiff J.S.  App. 6 at 44-46.

3.  J.S. transferred into the Keystone Oaks School District in November 2014 during

    the middle of his seventh-grade year.  App. 2 at 21.

4.  At that time, J.S. was not identified as a student with a disability and did not have

    a 504 Service Agreement or an Individualized Education Program ("IEP").  App.

    2 at 21.

5.  On March 26 and 31, 2015, J.S. engaged in unwanted interactions and

conversations with a female classmate.  App. 4 at 23-24; App 6 at 47, 49.

6.  On April 10, 2015, Defendant issued an Evaluation Report, which determined that
    J.S. was eligible for special education and related services under the Specific
    Learning Disability category.  App. 6 at 50; App. 7 at 1-19.

7.  In the Evaluation Report, J.S.'s teachers noted that he did not have a "real friend"
    in class and did not engage with peers or participate in group discussion.  App. 7
    at 1-2.

8.  On May 8, 2015, Defendant issued an IEP which provided J.S. with an itinerant
    level of learning support, with all assistance being provided in the general
    education classroom.  App. 7 at 20-46.

9.  The specially designed instruction ("SDI") and modifications included in the IEP
    were the following:  (1) copies of class notes; (2) use of classroom computer to
    type out classwork or homework; (3) allowance of verbal responses to questions if
    computer not available; (4) reduction of written assignments; (5) adaptation of
    paper to assist with handwriting; (6) graph paper for math; (7) highlighting of
    areas where answers are to be written on worksheets; (8) meeting with teachers to
    review writing demands in each course; (9) preferential seating for on-task
    behavior and checks for understanding; (10) prompting, proximity control,
    redirection, and praise to assist with participation and engagement in the
    classroom; (11) structured use of planner and folder system for organization;
    (12) check-in/check-out to ensure homework written in planner and turned in;
    (13) quiet place for reading assistance and assistance with written answers;
    (14) increased time to respond verbally; (15) adapted tests; and (16) extended

time on tests and assignments.  App. 7 at 39-41.

10.  On May 12, 2015, J.S. received a two-day out-of-school suspension for allegedly

exposing his private parts to same-sex students in school.  App. 4 at 38-39; App. 7

at 48.

11.  During that time period, the principal did not bring a psychologist with him to talk

to J.S. about these incidents.  He did not bring in a behavioral specialist or

individual with social skills training to speak with J.S.  App. 5 at 14-15.

12.  A Functional Behavior Assessment ("FBA") was not initiated.  App. 5 at 17.

13.  J.S. returned to Defendant's school for his eighth grade year.  App. 4 at 41.

14.  On September 28, 2015, J.S. made inappropriate statements about the same

female classmate to a teacher and other students.  App. 4 at 36-37.

15.  He was warned that any further such offenses would result in detention or

suspension.  App. 4 at 36-37.

16.  No FBA was initiated at that time.  App. 5 at 19.

17.  On October 19, 2015, J.S. circled the same female classmate's table in the school

cafeteria and stated to a teacher in the cafeteria, "If I cannot have her, no one can

have her."  App. 4 at 41-44; App. 7 at 50.

18.  J.S. was sent to the principal's office where the principal and school resource

officer questioned him.  They asked him what he would hypothetically do if the

female student had a boyfriend in two weeks.  He responded that he would get gas

and matches and burn him.  App. 4 at 44-46; App. 8 at 1.

19.  The principal contacted P.S. and instructed her to take J.S. for an evaluation at

Western Psychiatric Institute and Clinic or St. Clair Hospital.  He indicated that

3

J.S. would not be allowed to return to school until P.S. had done so.  App 3 at 38; App. 8 at 1.

20.    J.S. received a three day out-of-school suspension.  App. 4 at 44.

21.    On October 20, 2017, P.S. took J.S. to Western Psychiatric Institute and Clinic ("WPIC"), where he was evaluated.  J.S. was not admitted that day.  App. 2 at 26-27.

22.    Defendant arranged to meet with P.S. on October 23, 2015 to discuss the incident and determine next steps.  App. 4 at 48-49.

23.    The principal asked P.S. to provide them with paperwork from WPIC, but the principal did not recall whether she stated that she had it.  App. 4 at 49; App. 5 at 10-11.

24.    The principal did not have any contact with the evaluator from WPIC and had no other means at that time to find out information regarding the evaluation other than from P.S.  App. 5 at 1.

25.    At some point, the principal spoke with P.S. on the phone and was allegedly told that J.S. had been diagnosed with early psychosis but was not admitted or medicated.  App. 4 at 49-51; App. 5 at 1.

26.    On October 22, 2015, the principal sent an e-mail to the Director of Special Education summarizing his phone conversation with P.S.  App. 8 at 2.

27.    The principal explained that he did not believe that WPIC would "place" J.S. and indicated that the District "may need to be ready with our option tomorrow as well."  App. 8 at 2.

28.    The Director of Special Education responded that a staff member would be able to

4

speak about "partial."  App. 8 at 2.

29.   The principal did not review any documentation regarding J.S. when considering
      a placement option.  App. 4 at 7.

30.   No FBA was considered at this time.  App. 4 at 7-8.

31.   On October 23, 2015, Defendant and Plaintiffs met.  Attendees at this meeting
      were the principal, the Director of Special Education, J.S.'s special education
      teacher, P.S., and J.S.  App. 4 at 3, 8.

32.   At the meeting, Defendant provided P.S. with a permission form for J.S. to
      receive mental health services through the Student Assistance Program, which is
      available to general education and special education students in Defendant
      District.  P.S. signed the permission form.  App. 5 at 40-41; App. 6 at 25.

33.   The principal and Director of Special Education did not have documentation from
      WPIC at the time of the meeting.  App. 5 at 20, 39-40, 44-45.

34.   The same day as the meeting, the Director of Special Education faxed a referral
      form to Wesley Spectrum to begin the placement process.  App. 8 at 9.

35.   The referral noted that the specified program of interest was the partial
      hospitalization program within the Approved Private School.  The referral form
      indicated that the referral agency was the Defendant school district.  App. 8 at 9.

36.   A revised IEP was issued on October 23, 2015 after the meeting.  App. 8 at 6-8.

37.   The only change was a new SDI:  opportunities for J.S. to meet with the mental
      health therapist on an as-needed basis.  All other services and SDI remained the
      same. App. 4 at 11; App 8 at 8.

38.   No crisis plan was initiated.  App. 4 at 20.

39.     The principal testified that the intent was for J.S. to go to another program and to leave Defendant's school.  App. 4 at 14-16; App. 5 at 25-26.

40.     After the meeting, Defendant set up a temporary schedule for J.S. whereby he would be in Defendant's learning support classroom for a large portion of the day with one period in the principal's office and two periods with the school's mental health therapist.  App. 4 at 14-15.

41.     J.S. would also be escorted by the mental health therapist, a teacher, or the principal throughout the day.  App. 5 at 4.

42.      J.S. was not provided access to Defendant's emotional support classroom.  App. 4 at 22.

43.     As testified to by the principal, both the new schedule and the IEP change were viewed as a temporary measure while awaiting placement at an Approved Private School.  App. 4 at 14-16; App. 5 at 25-26.

44.     On October 26, 2015, while on this revised schedule, J.S. ran out of the learning support classroom and hugged the female classmate from earlier incidents.  App. 5 at 4.

45.     J.S. was suspended for three days as a result and issued a citation by the school resource officer.  App. 4 at 4-5; App. 8 at 3.

46.     On October 27, 2015, the principal e-mailed the Superintendent, stating that the Director of Special Education was exploring other placement options for J.S.  App. 8 at 3.

47.     On November 4, 2015, Defendant issued a Notice of Recommended Educational Placement ("NOREP") placing J.S. at Wesley Spectrum K-8, an Approved

6

Private School.  The only option listed under "Options Considered" was "Special

Education Supports in the student's neighborhood school."  App. 8 at 10-11.

48.     The NOREP proposed that the level of support change to full-time emotional

support from itinerant learning support.  App. 8 at 10-11.

49.     On November 6, 2015, J.S. began attending school at Wesley Spectrum.  App. 6

at 4.

50.     A new IEP was developed on December 14, 2015, which included progress

monitoring from J.S.'s time in his neighborhood school.  App. 8 at 14-50; App. 9

at 1-9.

51.     This progress monitoring indicated that J.S. had made progress on his

communication goal and academic goals while enrolled at his neighborhood

school.  App. 6 at 5-6; App. 8 at 19-20.

52.     P.S. did not sign the NOREP issued on November 4, 2015 until February 8, 2016.

App. 8 at 12.

53.     On January 18, 2017, J.S. began transitioning back to his neighborhood school.

App. 6 at 11.

54.     He completely transitioned back to his neighborhood school on March 27, 2017.

App. 6 at 11-12.

55.     On or about March 1, 2018, the Plaintiffs filed a Due Process Complaint

captioned ODR No. 20344-17-18.   App. 9 at 10-18.

56.     During the one day hearing, the Hearing Officer issued an order requiring

additional evidence be produced, specifically any records regarding services or

interactions between WPIC and J.S. from October 2015 through March 2017.

App. 6 at 40-41.

57.     Plaintiffs provided the requested documentation to the Hearing Officer on August

        27, 2018 along with a Motion in Limine requesting that the newly acquired

        documentation not be entered into the evidentiary record because neither party

        was in possession of the requested evidence at the time the placement

        determination was made.  App. 9 at 23-27.

58.     The Hearing Officer denied the motion, stating that such evidence was necessary

        to resolve a "material dispute" between the parties involving "what may, or may

        not, have been shared with the school principal by the student's mother in October

        2015 upon discharge from Western Psych."  App. 28-29.

59.     The Hearing Officer issued a Decision dated September 30, 2018, determining

        that Defendant had not violated the least restrictive environment requirement of

        the IDEA.  App. 1 at 1-25.

60.     The Hearing Officer included in his factual findings information taken from the

        WPIC evaluation and recommendations from a follow-up appointment.  App. 1 at

        13-14, 16.  This information was provided to the Hearing Officer in response to

        his order requiring production of certain documents.  App. 1 at 13 n.6.

61.     Specifically, the Hearing Officer made the following factual findings related to

        these produced documents:

            44.   On October 20, 2017, the parent took the student to a
            psychiatric clinic for a psychiatric evaluation related to the
            student's interactions with student X in the school environment.
            (Hearing Officer Exhibit ["HO"]-2 at pages 7-10).

            45.  When asked about the interactions with student X, the student
            reported that it made the student sad when student X asked to be
            left alone when student X characterized the student's behavior as

"creepy". The evaluator noted, however, that the student smiled as the student made these statements/observations, an affect which the evaluator noted as inappropriate (HO-2 at pages 7, 9).

46. The psychiatric evaluation yielded a provisional diagnosis of an unspecified schizophrenia spectrum/other psychotic spectrum disorder. The evaluator noted that his diagnosis was based on the inappropriate affect, avoidance of eye contact, and perseveration on student X. (HO-2 at pages 9-10).

47. The psychiatric evaluator recommended follow-up with a program at the psychiatric clinic. (HO-2 at page 10).

. . .

59. On Tuesday, October 27, 2015, the student had the follow-up appointment with the psychiatric clinic. The treatment plan from the psychiatric clinic recommended a partial hospitalization program. (HO-2 at page 13).

App. 1 at 13, 16.

62. The Hearing Officer also made the following factual finding: "The mental health evaluation was not provided to the District. The only information the District had was the mother's indication about the evaluation." App. 1 at 14.

63. The Hearing Officer outlined the relevant law, including one citation to *Oberti v. Board of Education*, 995 F.2d 1204 (3d Cir. 1993), defining the requirement that students with disabilities be placed in the least restrictive environment. App. 1 at 19.

64. The Hearing Officer did not explain the two-step test established by *Oberti*. App. 1 at 18-24.

65. After outlining a chronology of facts, the Hearing Officer provided the following analysis:

At this point in the chronology of events, the question in terms of parent's claim is whether the District inappropriately moved to

deliver the student's IEP in a partial hospitalization program outside of the District. Said another way, was the fact that the student was receiving services under an IEP in the partial hospitalization program a violation of the LRE mandate? The answer, on this chronology and under these facts, is clearly no.

This chronology, and the fact-finding above, centers on events that arose well before the scope of the parent's claim for remedy. Namely, these events date from the student's enrollment in the District in December 2014 and focused mainly on the events as of October 2015, pre-dating by months the claim of parent for remedy as of March 2016. Yet this chronology and these events are the necessary backdrop to the assertion that, as of March 2016, the student was inappropriately receiving services under the IEP in violation of the LRE mandate of IDEIA.

The evidentiary record as to the delivery of those services, and the student's progress or purported lack of progress, over the period March 2016 through March 2017 is sparse. Indeed, parent fails to meet her burden as to any alleged denial of FAPE for inappropriate design of implementation of the services at the partial hospitalization program from May 2016 through May 2017, when the student had fully transitioned back to the District. Likewise, parent fails to meet her burden for any such claim on the District's part during the transition months of January – March 2017 where the student was receiving some degree of services from the District.

But, as the record shows, the parent's claim is not rooted in programming/services/progress as much as a placement claim regarding the LRE. As, as set forth above, on this record and under these facts, the District met its obligations to the student. Accordingly, the District provided to the student FAPE in the LRE over the period March 2016 – March 2017.

App. 1 at 23-24.

66.     On or about December 28, 2018, Plaintiffs filed the instant Complaint in the Western District of Pennsylvania. CM/ECF No. 6.

67.     On May 17, 2019, the parties engaged in mediation, wherein resolution was not reached. CM/ECF No. 27.

Respectfully submitted,

RUDER LAW, LLC

Date: <u>July 10, 2019</u>                    By:      <u>/s/ Kristen C. Weidus</u>
                                                       Kristen C. Weidus, Esq.
                                                       PA I.D. # 313486
                                                       429 Forbes Ave.
                                                       Suite 450
                                                       Pittsburgh, PA 15219
                                                       (412) 281-4959

                                                       <u>/s/ Toni Haraldsen</u>
                                                       Toni Haraldsen, Esq.
                                                       PA I.D. # 318834
                                                       429 Forbes Ave.
                                                       Suite 450
                                                       Pittsburgh, PA 15219
                                                       (412) 281-4959