# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.S., a minor by his parent, P.S.,<br>and on his own behalf, | ) | Magistrate Judge Patricia L. Dodge |
| | ) | |
| **Plaintiff,** | ) | No. 2:18-cv-1713 |
| | ) | |
| v. | ) | |
| | ) | |
| Keystone Oaks School District, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## APPENDIX TO CONCISE STATEMENT OF FACTS

### Volume 3

Respectfully submitted,

RUDER LAW, LLC

Date: <u>July 10, 2019</u>          By:     <u>/s/ Kristen C. Weidus</u>
Kristen C. Weidus, Esq.
PA I.D. # 313486
429 Forbes Ave.
Suite 450
Pittsburgh, PA 15219
(412) 281-4959

<u>/s/ Toni Haraldsen</u>
Toni Haraldsen, Esq.
PA I.D. # 318834
429 Forbes Ave.
Suite 450
Pittsburgh, PA 15219
(412) 281-4959

Page 76

P. ███████ - Cross

2  complete your answer?

3          THE WITNESS:  Yes.

4          HEARING OFFICER McELLIGOTT:  We are ready

5  for the next question.

6      Q.   Were you present at the meeting with Officer

7  Bruner and Mr. Kattan and your child?

8      A.   Yes.

9      Q.   You were there?

10      A.   Yes.

11      Q.   So you were there during the conversations

12  when asked what he would do if the student had a

13  boyfriend, he said he would watch him burn; you were

14  there?

15      A.   No, I was not there.

16      Q.   So when you make statements as to what you

17  believe Officer Bruner said, that was based upon what

18  you son told you?

19      A.   What my son told me, yes.

20      Q.   Did your son tell you that he would also

21  like to watch a husband that this particular female

22  may have burn later in life?

23      A.   No, he did not tell me that.

24      Q.   He didn't tell you about that?

25      A.   No.

*NICKEL REPORTING SERVICE - (412) 494-9928*

P. ███████ - Cross

1

2     Q.   Did he tell you that if she had any

3     boyfriends that he would watch them burn?

4          MS. MODELL:  Objection.

5          HEARING OFFICER McELLIGOTT:  Wait.

6     Objection?

7          MS. MODELL:  I'm going to object as far as

8     badgering and she's reading entire E-mails that are

9     already entered into evidence.

10         HEARING OFFICER McELLIGOTT:  I am going to

11    overrule the objection.  The witness has asserted

12    what is relayed in the E-mail is not accurate from

13    her perspective.  So I hear the question as detailing

14    the witness's understanding in that regard.

15         So objection overruled.  You can answer the

16    question.

17    Q.   So it's after this E-mail that you agreed to

18    take your son to Western Psych?

19    A.   Yes.

20    Q.   So although you dispute the content of the

21    E-mail today, when you received it October 20, 2015,

22    you took action in response to this; is that correct?

23    A.   Yes.

24    Q.   And you took your son to Western Psych?

25    A.   Yes.

1        P. ███████ - Cross

2        Q.   And if we go to the E-mail above that, it is

3    dated October 22, and again, it is from Mr. Kattan to

4    you, and he's seeking to confirm the meeting on

5    October 23?

6             MS. MODELL:  I didn't hear the question.

7             MS. LANE:  Waiting for her to finish her

8    review.

9             THE WITNESS:  Yes, I remember this.

10       Q.   Do you recall speaking to Mr. Kattan on the

11   phone between these E-mails?

12       A.   No.

13       Q.   Did you report back to the District that you

14   had completed your evaluation at Western Psych?

15       A.   Yes, I told them I went to WPIC.

16       Q.   WPIC?

17       A.   Yes.

18       Q.   When did you tell them that?

19       A.   I told them that they said there was nothing

20   wrong with my son.

21       Q.   My question is a little more nuanced than

22   that.  Did you send an E-mail or did you call the

23   District to inform them?

24       A.   I am not sure.  It was 2016.  I am not sure.

25   We are in 2018 now.

*NICKEL REPORTING SERVICE - (412) 494-9928*

1          **P. ████████ - Cross**

2       Q.   It was, actually, 2015.  So, yeah, I agree

3   that that was some time ago.  The E-mail from

4   Mr. Kattan asks you to please bring paperwork from

5   the doctor so the District is aware of the

6   recommendation?

7       A.   Uh-huh.

8       Q.   Did you bring any paperwork from the WPIC?

9       A.   I am not sure.

10      Q.   So as of today, you're not sure, but at that

11  point in time, the District, at least from their

12  perspective, believed you had paperwork and asked you

13  to bring it to this meeting?

14      A.   They didn't give me no paperwork.  I told

15  you the doctor said there is nothing wrong with my

16  son.  He is a typical teenager, his hormones were

17  raging.

18           And this early psychosis, I don't know where

19  you come up with that.  I don't have no documentation

20  of that, nor do I have paperwork.

21      Q.   There is -- I am sorry.  There is, on Page 5

22  of 25, the same exhibit --

23      A.   5 of 20 --

24           HEARING OFFICER McELLIGOTT:  The next page,

25  ma'am.

1          P. ███████ - Cross

2     Q.   School District 22, Page 5.  There is an

3  E-mail, it appears to be one, two, three -- I want to

4  draw your attention to the third E-mail which is

5  again between you and Mr. Kattan; do you see where I

6  am?

7     A.   Uh-huh.

8     Q.   Again, it appears to be conversation about

9  having that October 23 meeting and asking for someone

10  to bring you to the school; is that correct?

11     A.   Correct.

12     Q.   And then the prior E-mail is, again, from

13  you to Mr. Kattan, and you're acknowledging that you

14  will be in attendance, but you need a ride; is that

15  correct?

16     A.   Correct.

17     Q.   At that meeting on October 23, you recall

18  Ms. Burns being in attendance; is that correct?

19     A.   Ms. Burns was always in attendance.  She is

20  in Special Education classes.  Why wouldn't she be?

21     Q.   I would like to draw your attention to

22  Exhibit 10?

23     A.   What page are you on?

24          (School District Exhibit No. 10 was marked

25  for identification and admitted into evidence.)

Page 81

1        P. ███████ - Cross

2        HEARING OFFICER McELLIGOTT:  Is that School

3  10?

4        MS. LANE:  School 10, Page 1 of 2.

5        HEARING OFFICER McELLIGOTT:  In that book.

6  Tab 10, ma'am.  Ma'am?  Ms. S███████, the tabs --

7        THE WITNESS:  This one?

8        HEARING OFFICER McELLIGOTT:  No.  The tabs.

9  There you go.

10       Q.   If you would go to Page 2 of this exhibit,

11  at the top of the paper, is that your handwriting?

12       A.   Yes.

13       MS. MODELL:  That doesn't correspond to

14  anything we have.

15       THE WITNESS:  What do you need my

16  handwriting for?

17       HEARING OFFICER McELLIGOTT:  One second,

18  ma'am.  There is no question on the table.  I have it

19  S-10, on Page 2, a handwritten note.  Page 2.

20       THE WITNESS:  Got it.

21       HEARING OFFICER McELLIGOTT:  One second,

22  please, Ms. Lane.

23       (Reporter read back from the record.)

24       HEARING OFFICER McELLIGOTT:  The witness

25  confirmed that is her handwriting.  We are ready for

*NICKEL REPORTING SERVICE - (412) 494-9928*

Page 82

1              P. ████████ - Cross
2    the next question.
3        Q.   That's your contact information, the phone
4    number listed on the document?
5        A.   Yes.
6        Q.   If you go to the first page of the document,
7    you will notice there was a number of names towards
8    the right-hand margin, and it appears to be
9    referencing October 23, 2015, at 8 a.m.  Was the
10   October 23 meeting, if you recall, early in the
11   morning at 8:00?
12       A.   I don't even see where you are.  Where are
13   you?
14           HEARING OFFICER McELLIGOTT:  Are you on Page
15   1 of the document, ma'am?
16           THE WITNESS:  Yes.
17       Q.   Do you see it at the top, there is a date
18   entry and a time?
19       A.   Yes, October 23, 8:00 a.m.
20       Q.   Do you recall that meeting occurring around
21   that time frame?
22       A.   Yes.
23       Q.   And towards the right-hand margin, the names
24   listed is Kattan, Burns, Palmieri, mom, and ████████
25       A.   Uh-huh.

*NICKEL REPORTING SERVICE - (412) 494-9928*

Page 83

1               P. ████████ - Cross

2       Q.    Do you recall those individuals being

3   present at that October 23 meeting?

4       A.    Yeah.

5       Q.    So it was both you and ████████ in

6   attendance?

7       A.    Uh-huh.

8       Q.    Okay.

9             HEARING OFFICER McELLIGOTT:  Yes or no?

10            THE WITNESS:  Yes.

11      Q.    There is a reference within the notation,

12  you, in your direct questioning stated that the

13  doctor, basically, said nothing was wrong with

14  ████████ he was hormonal, and there was no

15  follow-up.

16            Wasn't there a follow-up appointment that

17  you were going to go back to WPIC?

18      A.    No.  There was no follow-up.

19      Q.    So when the School District references,

20  please bring the documentation, that is inaccurate?

21      A.    That was not accurate, because he wasn't

22  diagnosed with anything.  If he was diagnosed, I

23  would be more than happy to bring you any

24  documentation that they have given me.

25            MS. LANE:  We will note for the record that

Page 84

1          P. ████████ - Cross
2  we have requested that Western Psych evaluation, and
3  according to counsel, they are working on getting it.
4       Q.    There was a reference within the document as
5  to you going back to the doctor on Tuesday.  Did you
6  have a different doctor appointment than WPIC
7  following this meeting?
8       A.    That was his well child appointment doctor.
9       Q.    And what was the purpose of attending the
10 well child visit?
11      A.    He gets checkups.  You get your normal
12 checkup every year.
13      Q.    Did you attend the intake meeting at Wesley
14 Spectrum?
15      A.    Yes, I did.
16      Q.    Did Ms. Burns take you to that appointment?
17      A.    Wesley Spectrum, no.  My girlfriend took me
18 for the registration.
19      Q.    So that was the intake meeting?
20      A.    That was the registration.  The way they
21 told me was that you all planned for ████████ to
22 attend that school.  I took him there.  I had all the
23 paperwork to fill out.  The day I filled the
24 paperwork out, the next day he was to start.  He
25 didn't come back here to Keystone Oaks.

*NICKEL REPORTING SERVICE - (412) 494-9928*

Page 85

P. ███████ - Cross

1
2    Q.   So you don't believe he came back after that
3    October 23 meeting?
4    A.   Oh, yeah.  He was back here.  I am talking
5    about when I registered him for Wesley Spectrum.
6    Q.   So November is when he would have started
7    attending --
8    A.   He started November 6, if I am not mistaken.
9    Q.   Did you work with a Melissa Palmieri in the
10   intake meetings at Wesley Spectrum; is that name
11   familiar to you?
12   A.   I am not sure, ma'am.  That has been some
13   time ago.
14   Q.   Okay.  When you enrolled your son in
15   Keystone Oaks, you filled out an enrollment form with
16   whatever relevant information you would have about
17   your son, where you live, who lives in your home; do
18   you remember that process?
19   A.   Yeah.  It was like, you know, what you fill
20   out, you have to bring documents to make sure that
21   you're appropriate and you live in the right school
22   district.
23   Q.   So we have what is a combined exhibit.  It
24   should be Exhibit 3 and 4, and Pages 1 through 38.
25   And we are referring to this as kind of like a

1                    P. █████████ - Cross

2    permanent record that includes █████████ grades, but

3    also enrollment documentation.

4           So if you go towards the -- those are your

5    signatures, Page 16 of 36.

6           (School District Exhibit No. 3 was marked

7    for identification and admitted into evidence.)

8           HEARING OFFICER McELLIGOTT:  If you would

9    identify the page for me, Ms. Lane?

10          MS. LANE:  16 of 36.

11          HEARING OFFICER McELLIGOTT:  Right.  I am

12   working across both of those.

13          MS. LANE:  I am sorry.  It says 36 on the

14   bottom.

15          HEARING OFFICER McELLIGOTT:  Right.  The

16   page numbers don't exactly match up for me, which is

17   fine, but what does it say at the top of the page,

18   what am I looking for?

19          MS. LANE:  If you look at the bottom, it is

20   not saying School District 4, Page 12 of 36 or 16 of

21   36, on your documents, it doesn't say that?

22          HEARING OFFICER McELLIGOTT:  Well, I have

23   S-4, it is a 36-page document.  I thought you were

24   combining 3 and 4 into a 38-page document.

25          MS. LANE:  Actually, the first two pages is

Page 87

1              P. ███████ - Cross
2    what should have been the first two pages of the
3    entire document.  That was a mistake.
4              HEARING OFFICER McELLIGOTT:  So your
5    reference today is going to be to S-4 as produced?
6              MS. LANE:  Just so that -- for ease of Ms.
7    S█████, at the bottom of the page, when I direct
8    her attention to it, it says S-4, Page 12 of 36.
9              HEARING OFFICER McELLIGOTT:  And at the top,
10   it says, request for school records?
11             MS. LANE:  Right.
12             HEARING OFFICER McELLIGOTT:  Okay.  Go to
13   Tab 4, ma'am, and then Page 12 of 36.  And at the
14   top, it will say request for school records; do you
15   have that, ma'am?
16             THE WITNESS:  Yes.
17        Q.   Do you recognize your signature at the
18   bottom?
19        A.   Yes.
20        Q.   The forms we talked about, you said you were
21   familiar with enrolling your son?
22        A.   Yes.
23        Q.   So the prior school district, was that
24   Sto-Rox?
25        A.   Yes.

1               P. ███████ - Cross

2        Q.    So this form is asking you to agree to send

3     any information that the prior school would have had

4     for ███████

5        A.    Yes.

6        Q.    And did he attend Sto-Rox pretty much from

7     age of entry, kindergarten until he came to Keystone?

8        A.    No.  He did not.  He attended Sto-Rox in

9     sixth grade.  He attended Woolslair from kindergarten

10    to fifth grade.

11       Q.    Is that Pittsburgh Public, Woolslair?

12       A.    Yes.  It is in Bloomfield.

13       Q.    So there was a point in time he was in

14    Pittsburgh Public?

15       A.    Uh-huh.

16       Q.    It is your testimony that through all that

17    period, he had never been identified --

18       A.    Never ever.

19       Q.    I want you to look at page -- Exhibit 7.

20             (School District Exhibit No. 7 was marked

21    for identification and admitted into evidence.)

22             HEARING OFFICER McELLIGOTT:  Tab 7, ma'am.

23    Ma'am, not Page 7, Tab 7.

24       Q.    So this document has been identified as a

25    series of E-mails between you and school staff over

*NICKEL REPORTING SERVICE - (412) 494-9928*

1                    P. ████████ - Cross

2    concerns with ████████ math performance; do you

3    recall those communications?

4        A.   Yeah.

5        Q.   This is occurring in February of 2015, these

6    E-mails, at that time, you are questioning -- you

7    said you had concerns with his grades?

8        A.   Yes.  I had concerns with his grade when he

9    was at Sto-Rox.  That is how I could tell something

10   was wrong with my son.

11       Q.   There is a reference to occupation therapy.

12   Where had ████████ received -- or had he ever

13   received occupational therapy?

14       A.   He received it at Sto-Rox because his

15   penmanship was not great, so when he would write, the

16   words would go together and it seemed like one long

17   word.  So they gave him the occupational therapy

18   machine and it was better for the teachers, as well

19   as himself to use this so they could understand what

20   he was doing.

21            HEARING OFFICER McELLIGOTT:  Approximately,

22   30 minutes remain.

23       Q.   So there was a point in time when the

24   District sent you a Permission to Evaluate form?

25       A.   Uh-huh.

1                    P. ████████ - Cross

2        Q.   And initially the document sought permission

3   specifically for occupational therapy, OT services?

4        A.   Right.

5        Q.   And then you, as you stated, had concerns

6   with performance in math?

7        A.   His grades.

8        Q.   So the District then sent a reissued

9   permission for your consent to allow testing for --

10  to address those concerns, the concerns you have, you

11  use the terminology penmanship and then concerns with

12  his grades.

13            Did you have particular concerns as to

14  whether reading, math --

15       A.   His basic subjects, reading, math, science,

16  social studies.

17       Q.   Do you recall you granted permission for the

18  District to conduct that testing?

19       A.   Yes.

20       Q.   And following that permission, there would

21  have been a compiled report; do you recall having

22  received a report and having a meeting about that

23  report?

24       A.   Yes.

25       Q.   And in the white binder are Parent exhibits,

*NICKEL REPORTING SERVICE - (412) 494-9928*

1                      P. ████████ - Cross

2    so I would like to direct your attention to P-1 and

3    P-2.

4              (Parent Exhibit Nos. 1 and 2 were marked for

5    identification and admitted into evidence.)

6        Q.   So follow the same, looking at the tabs as

7    the -- No. 1 as Exhibit 1.  P-1 is a letter dated

8    January 23, to your attention; is that correct?

9        A.   Yes.

10       Q.   And in it it is asking and identifying to

11   you a Permission to Evaluate consent form, and in the

12   body of the document, it references for OT services,

13   and it informs you that the Allegheny Intermediate

14   Unit will be conducting that evaluation?

15       A.   Right.

16       Q.   And if you look at Exhibit 2, this is the

17   attached Permission to Evaluate form; are you

18   familiar with it?

19       A.   Yes.

20       Q.   Okay.  And it is dated January 23 of '15,

21   and it's addressed to you?

22       A.   Correct.

23       Q.   And it proposes in the body, there are

24   blocks, the second block down, it says the evaluation

25   did propose for occupational therapy evaluation?

1              P. ██████ - Cross

2      A.   Correct.

3      Q.   Okay.  And if you go on to what is P-2, Page

4    3 of 4.  Is that your signature giving consent to

5    conduct that evaluation?

6      A.   Yes, it is my signature.

7      Q.   If you go to P-6 --

8           (Parent Exhibit No. 6 was marked for

9    identification and admitted into evidence.)

10   BY MS. LANE:

11     Q.   So this is a February 18 letter directed to

12   your attention?

13     A.   Uh-huh.

14     Q.   And it is referencing, as you and I

15   discussed, a second PTE consent form that was sent to

16   your attention to address concerns with additional

17   testing and evaluation by a school psychologist?

18     A.   Uh-huh.

19          HEARING OFFICER McELLIGOTT:  Yes or no?

20          THE WITNESS:  Yes.

21          MS. LANE:  Is your P-7 exactly the same, P-6

22   and P-7?

23          MS. MODELL:  Yes, I apologize.

24     Q.   If you look at P-8, it will be behind the

25   No. 8 tab; do you recognize this form?

1                   P. ███████ - Cross

2        (Parent Exhibit No. 8 was marked for

3   identification and admitted into evidence.)

4     Q.   Do you recognize this form?

5     A.   Yes, I do.  It is in my handwriting.

6     Q.   Am I correct that this is a form sent to

7   you, as the Parent of ██████ to provide

8   information as part of that evaluation process?

9     A.   I am not his caregiver; I am his mother.  So

10  why is it caregiver on the top?  I am not a

11  caregiver, I am his mother.  I am his Parent.

12    Q.   You recognize that underneath that it says,

13  Dear Parent/guardian?

14    A.   Yes.

15    Q.   And you as the Parent filed out this form,

16  you noted it is your handwriting?

17    A.   Yes.

18    Q.   If you could review this, I would like you

19  to tell us what your concerns were at that time?

20    A.   My concerns were what the paper says, his

21  basic skills, his reading, his math, science, social

22  studies, his penmanship.

23    Q.   And then School District 9.

24        (Parent Exhibit No. 9 was marked for

25  identification and admitted into evidence.)

1       P. ███████ - Cross

2            HEARING OFFICER McELLIGOTT:  School 9 or

3       P-9.

4            MS. LANE:  School 9 -- I am sorry, P-9.

5       These were originally proposed as Joints.

6            HEARING OFFICER McELLIGOTT:  Are you on P-9,

7       ma'am?

8            THE WITNESS:  Yes.

9       Q.   Are you familiar with this particular

10      document?

11      A.   This document doesn't look like any -- I

12      mean, I am used to the NOREP, but this document does

13      not look familiar to me.

14      Q.   If you go to the blue binder, there is a Tab

15      5 exhibit I would like to you review.

16           (School District Exhibit No. 5 was marked

17      for identification and admitted into evidence.)

18      Q.   Are you familiar with this document?

19      A.   Yes.

20      Q.   This is an invitation to participate in a

21      meeting?

22      A.   Correct.

23      Q.   And the document is marked as "other

24      discussed", and it appears to have the R's crossed

25      out for -- and added above it, and the E to say

1               P. ████████ - Cross
2     Evaluation Report?
3          A.    Uh-huh.
4               HEARING OFFICER McELLIGOTT:  Yes or no?
5               THE WITNESS:  Yes.
6          Q.    On the second page, is that your signature
7     agreeing to attend the meeting to discuss --
8          A.    Yes.  In 2015, that is my signature.
9          Q.    Do you recall having such a meeting to
10    discuss the Evaluation Report, which would be the
11    findings of the testing for your son?
12         A.    That was the meeting in 2015, and we are in
13    '18.  As far as what the meeting entailed, I don't
14    remember that.
15         Q.    Is it your testimony today that you were
16    never in attendance at a meeting to discuss an
17    Evaluation Report, or are you saying you just don't
18    have specific recall of that meeting?
19         A.    I was always in the meeting pertaining to my
20    son.  What I am saying to you is that is back then,
21    in 2015.  It is 2018 now is what I am saying to you.
22         Q.    Thank you.  We all appreciate the difficulty
23    presented by the time frame.  I just want the record
24    to be clear that you were in attendance, but perhaps
25    don't have specific recall of the meeting?

1          P. ███████ - Cross

2     A.   Yes.

3     Q.   So we have on Page 16 of 20, and that is in

4   the Parent binder, which is -- P-9, Page 16 of 20.

5        HEARING OFFICER McELLIGOTT:  The other

6   binder, ma'am.  You should be there.  P-9, in the

7   lower right.

8        THE WITNESS:  16 of 20 she said?

9        HEARING OFFICER McELLIGOTT:  No.  No.  P-9,

10  16 of 21.

11  BY MS. LANE:

12    Q.   Do you recognize your signature on the

13  document?

14    A.   Yes.

15    Q.   So this is indicating that you are in

16  attendance at a meeting to review P-9, which is the

17  Evaluation Report?

18    A.   Uh-huh.

19        HEARING OFFICER McELLIGOTT:  Yes or no?

20        THE WITNESS:  Yes.

21  BY MS. LANE:

22    Q.   Following that meeting, do you recall

23  attending a meeting to develop the IEP, the plan, for

24  your son?

25    A.   Yes.

*NICKEL REPORTING SERVICE - (412) 494-9928*

1              P. ██████ - Cross

2      Q.   If we can go to -- it is, I believe it

3  should be P-11.

4           (Parent Exhibit No. 11 was marked for

5  identification and admitted into evidence.)

6  BY MS. LANE:

7      Q.   Are you at P-11?

8      A.   Yes.

9      Q.   Are you familiar with this document?

10     A.   Yes.

11     Q.   And this is your son's IEP for the time

12 frame of May 8 of 2015; is that correct?

13     A.   Yes.

14     Q.   If we go on to Page 2 of 23, there are a

15 list of signatures; is your signature on this

16 document?

17     A.   Yes.

18     Q.   So you were present for the IEP meeting?

19     A.   Yes.

20     Q.   And on the third page, there is another

21 signature; is that your signature?

22     A.   Yes.

23     Q.   Indicating that you received the Procedural

24 Safeguards regarding your rights under Special

25 Education as a Parent for your child?

                    P. ███████ - Cross

2    A.   Yes.

3    Q.   This particular document identifies

4    information for the Evaluation Report, as well as

5    information shared by you; is that correct?

6    A.   Yes.

7    Q.   And it has a list of his strengths on Page

8    6, and it mirrors your testimony that he is polite

9    and respectful, has average ability in verbal

10   comprehension, oral reading, oral expression,

11   vocabulary and listening?

12   A.   Yes.

13   Q.   And you see underneath that, it has a

14   designation as to academics and a statement that

15   begins with ███████ needs?

16   A.   What page are you on?

17   Q.   I am sorry, I am on Page 6 of 27.  It is in

18   the far right corner.

19   A.   Yes.

20        HEARING OFFICER McELLIGOTT:  It is the same

21   page we were on, ma'am.  The entry right underneath

22   the strengths.

23        THE WITNESS:  You said 6 of 27?  Yeah, I see

24   it on the bottom.

25   Q.   Is this information provided in the IEP, is

1                        P. ████████ - Cross
2    that similar to your concerns as to areas your son
3    needed to have assistance?
4         A.   But there is no social skills in here.
5         Q.   Do you agree with the other information
6    contained within?
7         A.   Yes.
8         Q.   If you go up to Parental concerns, it would
9    be the first bullet, there is a black dot indicating
10   Parental concerns, and is that a summary of the
11   information we reviewed from your Parent input form?
12        A.   Once again, I am not his guardian.  I am his
13   Parent.  I am his mother.
14        Q.   We fully understand that.  It is just a form
15   so that it covers all.  Is this the information that
16   you provided in your Parent form?
17        A.   Yes.
18        Q.   Did you provide the School District
19   permission to implement this program; did you sign a
20   NOREP so that he could begin -- this would have been
21   his first IEP -- so he could begin to receive these
22   services?
23        A.   Yes.
24        Q.   I am trying to find your NOREP, I am sorry.
25   Can you go to blue binder, School District 9 includes

*NICKEL REPORTING SERVICE - (412) 494-9928*

```
 1                    P. ██████ - Cross
 2   the NOREP.
 3            (School District Exhibit No. 9 was marked
 4   for identification and admitted into evidence.)
 5            HEARING OFFICER McELLIGOTT:  I only have a
 6   one-page exhibit at S-9.
 7            THE WITNESS:  I only have a one-page, too,
 8   as well.  I don't have a NOREP here.
 9            MS. LANE:  Did you include the NOREP in the
10   documents?
11            MS. MODELL:  I included all the documents
12   you sent me, so --
13            HEARING OFFICER McELLIGOTT:  Well, let me
14   say this.  I don't hear any dispute.  I hear the
15   witness to say that she completed the NOREP.  Is
16   there a factual dispute that the NOREP was not --
17            MS. MODELL:  No.  I will stipulate that she
18   signed the NOREP.
19            HEARING OFFICER McELLIGOTT:  So in May of
20   2015, the NOREP is in place.
21            THE WITNESS:  Well, they had all that
22   documentation, so it should be here.
23       Q.   There is no question posed, so wait until I
24   get the form and I will ask you a question.
25            The NOREP would have been shared with
```

P. ████████ - Cross

1

2  counsel in the documents and were noted as what would

3  be filed in the Joint exhibit.  The NOREP is attached

4  in the District's document to the IEP.  I don't know

5  why it wasn't uploaded, but I certainly have a copy

6  here and will be putting it into evidence.

7          May I show this to the witness?

8          HEARING OFFICER McELLIGOTT:  Well, let me

9  get a copy so that Ms. Modell can see it.

10          MS. MODELL:  I have already --

11          MS. LANE:  I just want to make sure it is in

12  the record.

13          HEARING OFFICER McELLIGOTT:  I am

14  approaching Ms. Lane's counsel table, and I am going

15  to show this to Ms. Modell.  To the extent that the

16  document is stipulated to, we will bring it in as an

17  exhibit, but I don't -- do we need to talk about the

18  document if there is any --

19          MS. LANE:  I want the document in the

20  record.

21          HEARING OFFICER McELLIGOTT:  Any objection?

22          MS. MODELL:  No objection.

23          HEARING OFFICER McELLIGOTT:  Can you make

24  copies?

25          MS. LANE:  Do you want to attach it to 9 or

1          P. ███████ - Cross

2     have a whole other exhibit.

3          HEARING OFFICER McELLIGOTT:  I would rather

4     not have to repaginate.  So let's enter it as P-11A,

5     so it will come right after the IEP, so when we get

6     that back, we will mark it as such.

7          Do you want to wait until that returns to

8     question the witness about it, Ms. Lane, or do you

9     want to continue?  It is up to you.

10    BY MS. LANE:

11        Q.   Your counsel stipulated that you, in fact,

12    signed the NOREP and allowed your son to receive

13    Special Education Services; is that correct?

14        A.   Correct.

15        Q.   If you can go to, again, in the white

16    binder, which is P-12.

17             (Parent Exhibit No. 12 was marked for

18    identification and admitted into evidence.)

19        Q.   After October 23, or on that date, you were

20    at a meeting, we reviewed paperwork listing that you

21    and your son were present, you recalled Ms. Burns

22    being present because she had given you a ride to the

23    school, Mr. Kattan you also recalled being there, and

24    his Special Ed teacher was present; is that correct?

25        A.   If that is that lady with the -- like I

                         P. ███████ - Cross

1
2    said, I don't know who that is.
3        Q.    That is fair.  We went through, you agree
4    that as far as you do specifically recall, Mr. Kattan
5    Ms. Burns, you and ███████ being in a meeting on
6    October 23?
7        A.    Of what year?
8        Q.    Of 2015.
9        A.    Yes.
10       Q.    Thank you.  Do you recall discussions of
11   when ████████ was going to return to school that he
12   would receive -- meet with the District mental health
13   therapist, someone they had on staff?
14       A.    Yes, I did.
15       Q.    I am directing your attention to P-12.  At
16   the bottom of the page is an area that says the LEA,
17   meaning the School District and Parent, have agreed
18   to make the following changes to an IEP without
19   convening an IEP meeting, and this particular -- the
20   blocks on the page references October 23 of 2015; do
21   you see where I am?
22       A.    Uh-huh.
23       Q.    You would agree with me that it references a
24   change to the program as having ███████ meeting with
25   a mental health therapist on an as-needed basis and

1              P. ██████ - Cross

2    receive accommodations to help manage emotions at

3    that time; did I read that correctly?

4         A.    Yes.  He had a mental health therapist who

5    evaluated him and I no longer wanted her to be his

6    mental health therapist.

7         Q.    So this particular time, that was a service

8    offered?

9         A.    Yes.

10        Q.    There may have been changes in the future --

11        A.    There was changes --

12        Q.    But at this particular time, there was

13   discussion and the change to his program to add that

14   level of service; correct?

15        A.    Yes.  Yes.

16             HEARING OFFICER McELLIGOTT:  The copies of

17   P-11A have been returned, so let's -- before we lose

18   the thread, bring the NOREP in as P-11A.

19             (Parent Exhibit No. 11A was marked for

20   identification and admitted into evidence.)

21             MS. LANE:  Thank you.

22             HEARING OFFICER McELLIGOTT:  Ms. Modell is

23   handing a copy of P-11A to the witness.  If you would

24   just put that in the front binder of the white

25   notebook, the front page.

1                    P. ███████ - Cross

2          We will continue, Ms. Lane.

3   BY MS. LANE:

4      Q.   I would like you to go to -- in this

5   particular exhibit, it would be Page 2 of 3, and we

6   are still in P-12.

7      A.   You said page what?

8          HEARING OFFICER McELLIGOTT:  Same document,

9   just turn the page, ma'am.

10         THE WITNESS:  You said P-12, Page 2?

11         HEARING OFFICER McELLIGOTT:  That's right.

12     Q.   You're on the right page.

13     A.   No, I'm not.

14         HEARING OFFICER McELLIGOTT:  She needs to

15  turn the page.  There you go.

16         THE WITNESS:  I only have Page 6, Page 1 to

17  Page 6.

18         MS. MODELL:  You're on the correct page.

19         HEARING OFFICER McELLIGOTT:  One second.  In

20  the lower left-hand corner of that document, ma'am,

21  do you see where it says P-12, Page 2 of 3?

22         THE WITNESS:  I see P-12, Page 1 of 3.

23         HEARING OFFICER McELLIGOTT:  Turn the next

24  page.  Do you see where it says P-12, Page 2 of 3?

25         THE WITNESS:  Okay.

*NICKEL REPORTING SERVICE - (412) 494-9928*

1          P. ████████ - Cross

2          HEARING OFFICER McELLIGOTT:  We are always

3     referring to those numbers, regardless of what is

4     pre-printed on the page, that is that exhibit page

5     number.

6          THE WITNESS:  All right.  Thank you.

7          HEARING OFFICER McELLIGOTT:  Are you there?

8          THE WITNESS:  Yes.

9     Q.    I want to direct your attention, there is

10    information that has the date 10/23/15?

11    A.    Yes.

12    Q.    And this is information that you and the

13    team agreed to add to the IEP regarding ██████

14    anger with peers and staff and feeling emotional, and

15    references, again, him meeting with the mental health

16    therapist; do you recall that discussion with Ms.

17    Burns and Mr. Kattan on October 23?

18    A.    Yes.

19    Q.    And it'll just be the very next page, and it

20    is like a chart; are you on that page?

21    A.    Yes.

22    Q.    The very bottom, last chart entry, and

23    you -- if you move over the four blocks, it has a

24    date, and what is the date listed there?

25    A.    10/24/15.

1          P. ███████ - Cross

2     Q.   So that was the day after the meeting, this

3  is a service that is going to begin for ████████ in

4  school, that he would have -- and you use the

5  reference time-outs to process with the mental health

6  therapist?

7     A.   Correct.

8     Q.   Do you recall discussions of that service

9  for ████████

10    A.   Yes.

11    Q.   Was there a point in time, still in the end

12 of October time frame, you mentioned you went with

13 your girlfriend and ████████ to Wesley Spectrum, was

14 there a time frame where your Medicaid or Medicare

15 had lapsed?

16    A.   ████████ Medicaid has never lapsed.  He

17 still gets medical, even right now.

18         Now, I do have a meeting coming up this

19 Wednesday because I filed an appeal, but until I

20 filed the appeal to state that he is autistic now

21 that they won't cut it off because I got new

22 documentation from another doctor, which I did not

23 want to give to Keystone Oaks because they sat there

24 and mistreated my child all this time.  I felt there

25 was no need for them to have this documentation of

*NICKEL REPORTING SERVICE - (412) 494-9928*

```
 1              P. ███████ - Cross
 2   the neuropsychology.
 3          HEARING OFFICER McELLIGOTT:  Does that
 4   complete your answer?
 5          THE WITNESS:  Yes.
 6          HEARING OFFICER McELLIGOTT:  Ready for the
 7   next question.
 8      Q.   As best as you can recall at the time that
 9   you were visiting Wesley Spectrum, your contention
10   was that you had full medical care and that there
11   wasn't any reason to deny his entry under partial
12   hospitalization?
13      A.   His medical has never been terminated.  Like
14   I said, he still has medical now.  I have a court
15   hearing to go to this coming Thursday.
16      Q.   Okay.  I would like you to look at P-16.
17          (Parent Exhibit No. 16 was marked for
18   identification and admitted into evidence.)
19      Q.   Are you familiar with this particular
20   document in P-16?
21      A.   I have seen this document, but no, I am not
22   familiar with it.
23      Q.   You have seen it before and it is directed
24   to your attention?
25      A.   Yes.
```

1                         P. ███████ - Cross

2        Q.   What is the date that the document is sent

3   to you, typed in?

4        A.   I see November the 6th, 2015, the document.

5             HEARING OFFICER McELLIGOTT:  Is that on Page

6   1, ma'am?  Are you on the first page?  I am in the

7   NOREP; is that correct?

8             MS. LANE:  You are.

9             HEARING OFFICER McELLIGOTT:  I don't know if

10  the witness is in a NOREP.

11       Q.   Are you there in the white binder, page --

12  School District -- Parent 16, Tab 16.

13            (Discussion held off the record.)

14       Q.   So the date on this particular document, it

15  is directed to your attention, and it is dated

16  November 4 of '15?

17       A.   Yes.

18       Q.   And I had asked you, and we were on the

19  wrong exhibit, are you familiar with this particular

20  document?

21       A.   Yes.

22       Q.   And this is a document that seeks your

23  consent to implement any changes to your son's

24  program; is that your understanding?

25       A.   Yes.

*NICKEL REPORTING SERVICE - (412) 494-9928*

1              P. ████████ - Cross

2      Q.   Is there some time from the period of when

3  you received this document that you were perhaps

4  delaying or considering whether or not you would sign

5  it?

6      A.   Yes.

7      Q.   And is that perhaps answerable as to why you

8  don't sign your consent until February -- I believe

9  your signature is, if I read it correctly, February 8

10 of '16 is when you grant your approval?

11     A.   Uh-huh.

12          HEARING OFFICER McELLIGOTT:   Page 3, ma'am.

13 Page 3.  The witness is on the page, if we could have

14 the question again, Ms. Lane.

15     Q.   Do you grant your approval, with your

16 signature, on February 8 of '16?

17     A.   Yes.

18     Q.   And you would agree that there is some

19 period of time from when the NOREP was sent to you on

20 November 4 that you were reviewing or considering

21 whether or not you would give your consent?

22     A.   Right.

23     Q.   Do you recall having meetings with staff at

24 Wesley asking you to formally prepare -- finish and

25 complete these documents, the NOREP?

Page 111

1                    P. ███████ - Cross

2      A.   No.

3      Q.   You don't have any recall of that?

4      A.   No.  Like I said, I didn't sign the NOREP

5  until after ███████ was in school.  I didn't sign

6  the NOREP before he went to school, which I should

7  have signed the NOREP before he went to school.  I

8  was just under the impression that I was going to be

9  going for a tour of Wesley, I wasn't aware that they

10  were going to put my child there.

11      Q.   So when you received the document on or

12  after November 4, you didn't initially sign it;

13  correct?

14      A.   No.

15      Q.   And you waited until February to sign it?

16      A.   Uh-huh.

17      Q.   You've offered to me that is because you

18  were going through whatever thought process as to

19  whether or not you would agree?

20      A.   I am a Parent.  I am allowed to have second

21  thoughts on things that I want to sign or don't want

22  to sign.  That is my right by law.

23      Q.   It certainly is, and that is the reason for

24  the delay; correct?

25      A.   Yes.

1           P. ███████ - Cross

2       Q.   Your son also went through what is called an

3   assisted technology evaluation; do you recall that

4   process?

5       A.   Yes.

6       Q.   And he was given a device or some app on the

7   laptop to assist him in the programming; do you

8   recall that?

9       A.   Yes.  Correct.

10       Q.   And it was a name -- you used the term

11   Kurzweil in your prior testimony?

12       A.   Yes.

13       Q.   And that is your recall of the service, the

14   technology that was provided to him?

15       A.   Yes.

16       Q.   Did he have that when he went to Wesley, did

17   that go with him?

18       A.   No.

19       Q.   It didn't?

20       A.   No.

21       Q.   Did he have it here while he was in

22   attendance?

23       A.   He had it here at Keystone Oaks.

24       Q.   But --

25       A.   I don't think he had it at Wesley, no.  He

Page 113

1              P. ███████ - Redirect

2   didn't tell me he had, like, an assertive device at

3   Wesley.

4        MS. LANE:  I have no further questions for

5   this witness.

6        HEARING OFFICER McELLIGOTT:  Thank you, Ms.

7   Lane.  Give me one second, please.  Coming up on the

8   30-minute signpost.  31 minutes remain, should you

9   need that coming back.

10        There was a significant amount of time, Ms.

11  Haraldsen, if you have follow-up questions.

12        MS. MODELL:  May we have one minute, please?

13        HEARING OFFICER McELLIGOTT:  To consult with

14  your co-counsel.

15        MS. MODELL:  Yes.

16                REDIRECT EXAMINATION

17  BY MS. MODELL:

18    Q.   Ms. S██████, you testified that you took

19  ██████ to Western Psych for an evaluation in

20  October 2015?

21    A.   Yes.

22    Q.   Why did you agree to take him to Western

23  Psych?

24    A.   Because they wouldn't allow him back in

25  school if I didn't do so.

*NICKEL REPORTING SERVICE - (412) 494-9928*

Page 114

P. ████████ - Redirect

Q.    Then going to the October 23, 2015 meeting,
did the District propose Wesley Spectrum at that
meeting?

A.    Yes, they did.

Q.    Did they propose anything to keep ██████
at Keystone Oaks?

A.    Absolutely not.

Q.    And you testified that the District offered
time-outs with the mental health therapist at this
meeting; correct?

A.    Yes.

Q.    Did they offer scheduled appointments with
the mental health therapist?

A.    Whenever she was available, I think he met
with this mental health therapist once a week.

Q.    But there was not a specific, scheduled
time?

A.    No.

Q.    Did they offer time in an emotional support
room?

A.    I think that consists of the mental health
therapist as well.

Q.    But they did not offer any time, other than
meeting with a mental health therapist in an

1                  P. ███████ - Redirect

2    emotional support room?

3        A.    No.

4        Q.    Did they say that they should have a

5    Functional Behavioral Assessment conducted?

6        A.    I think they did, yes.  I think they did.

7        Q.    Did they do it?

8        A.    No.

9        Q.    Did they propose intensive social skills

10   training for ███████

11       A.    No, they did not.

12       Q.    You testified that Keystone Oaks did not

13   want ███████ why did you say that?

14       A.    All the time my child was suspended.  He

15   spent more time out of school, being suspended, than

16   in school.  Once again, I told you, a child with

17   autism does not readily walk up to a person and

18   introduce themselves.  They are quiet.  They are shy.

19   And that is how my son is.  He is quiet; he is shy.

20   It is going to take him some time to get to know a

21   person and sit there and talk to them.

22            He didn't mean that girl no harm.  He wants

23   friends and he had no friends here, and the teachers

24   treated him like crap.

25            MS. HARALDSEN:  Thank you.  No further

1          **P. ████████ - Recross**

2    questions.

3          HEARING OFFICER McELLIGOTT:  Thank you, Ms.

4    Haraldsen.

5          Any follow-up, Ms. Lane?

6          RECROSS-EXAMINATION

7    BY MS. LANE:

8    Q.   I just want to direct your attention to

9    School District 22, which is in the blue binder.

10   Just in reference to taking your son to Western

11   Psych, it is your contention that you only took him

12   because you believed he would not be able to return

13   without this evaluation?

14   A.   That is what Mr. Kattan said, he needed to

15   go to Western Psych before he could return to school.

16   Q.   It is your understanding that was to address

17   the alarming statements about burning people;

18   correct?

19   A.   Yes.

20   Q.   On this page, there are --

21         HEARING OFFICER McELLIGOTT:  What page are

22   you on?  I missed the reference.

23         MS. LANE:  Page 7 of School District 22.

24         HEARING OFFICER McELLIGOTT:  Thank you.

25   Q.   The third E-mail down is an E-mail from your

*NICKEL REPORTING SERVICE - (412) 494-9928*

1            P. ████████ - Recross

2  account to Melissa Palmieri?

3      A.   You said 7?

4           HEARING OFFICER McELLIGOTT:  Ma'am, not Tab

5  7.  Tab 22, and then in that document, Page 7 in the

6  lower right-hand corner, Page 7 of 25.

7           The witness is there, Ms. Lane, if you can

8  orient her.

9      Q.   I am looking directing your attention to the

10 E-mail from you to Melissa Palmieri, and it is dated

11 October 27 of 2015?

12     A.   Yes.

13     Q.   You are touching base with this person

14 because you are unable to get in contact with the

15 principal; is that correct?

16     A.   Yes.

17     Q.   And you reference that you took ████████ to

18 a meeting, what meeting are you referring to?  Was

19 that a meeting with Western Psych or a meeting with

20 the Wesley Spectrum intake?

21     A.   That was Wesley Spectrum, not Western Psych.

22     Q.   Okay.  And you're informing the school that

23 they are talking to you about a program and getting

24 ████████ in?

25     A.   Right.

1              P. ▮▮▮▮▮▮▮ - Recross

2      Q.    And you are keeping them updated on that?

3      A.    Right.

4      Q.    And you don't recall your son receiving

5 social skill groups or training prior to leaving

6 Keystone Oaks in 2015?

7      A.    Social skills with whom?

8      Q.    The School District staff.

9      A.    With whom?

10     Q.    You don't recall that, is the question?

11     A.    No.  Because was it one-on-one he was

12 getting social skills, or was it a bunch of people in

13 a social skills group?

14         HEARING OFFICER McELLIGOTT:  Ma'am, don't

15 ask her questions.  It is not a conversation.  Does

16 that complete your answer?

17         THE WITNESS:  Yes.

18     Q.    I would like to direct your attention to

19 School District 21.

20         (School District Exhibit No. 21 was marked

21 for identification and admitted into evidence.)

22         HEARING OFFICER McELLIGOTT:  The document

23 before that, Tab 21.

24 BY MS. LANE:

25     Q.    Do you see, within that block, your child's

*NICKEL REPORTING SERVICE - (412) 494-9928*

1              P. ███████ - Recross

2    name referenced?

3        A.    Uh-huh.

4            HEARING OFFICER McELLIGOTT:  Yes or no?

5            THE WITNESS:  Yes.

6        Q.    And if you go to School District 20, the

7    exhibit prior to that in the blue binder --

8            (School District Exhibit No. 20 was marked

9    for identification and admitted into evidence.)

10       Q.    This is a series of E-mails between school

11   staff, a Ms. Suzanne Lochie and Melissa Palmieri, and

12   the bottom E-mail asks for a list of students who are

13   in need of a social skills group; do you see where

14   that reference is?

15       A.    Uh-huh.

16           HEARING OFFICER McELLIGOTT:  Yes or no?

17           THE WITNESS:  Yes.

18       Q.    And at the top there is a blacked-out box,

19   and underneath that, listed as No. 4, your son's

20   name, ████████████

21       A.    Yes.

22       Q.    And that this particular teacher is

23   informing Ms. Lochie that your son is in need of

24   social skills?

25       A.    Yes.

**NICKEL REPORTING SERVICE - (412) 494-9928**

1      P. ███████ - Recross

2    Q.   And should be a part of these groups?

3         HEARING OFFICER McELLIGOTT:  Is there an

4    answer, ma'am?

5         THE WITNESS:  Yes.

6         MS. LANE:  I think that is everything.

7    Thank you.

8         HEARING OFFICER McELLIGOTT:  Thank you, Ms.

9    Lane.  Let me see if I have any questions for you.  I

10   do have perhaps one or two clarifying questions.

11        When did ███████ begin to attend Wesley

12   Spectrum?  I don't think you testified to that.  When

13   did he actually start going there?

14        THE WITNESS:  He started Wesley Spectrum, I

15   want to say, in 2014.  I want to say, '15.  I think

16   '15 and he transitioned back in 2017.

17        HEARING OFFICER McELLIGOTT:  Let me kind of

18   orient you to what I think I know, from what I have

19   seen, but I am looking to you for more precision.

20        It appears that in October of 2015,

21   beginning in October of 2015, there were meetings

22   between you and school officials and those meetings

23   about services and potentially having ███████ not

24   attend school in the District, and those

25   conversations continued through November of 2015, and

1               P. ██████ - Recross

2   in November of 2015, there was a NOREP, and if you

3   want to refer to it, it is at P-16, but there was a

4   NOREP, and the NOREP says, the Keystone Oaks School

5   District wants to send ██████ to Wesley Spectrum.

6          When did he, actually, start going to Wesley

7   Spectrum as a student, every day, attending as a

8   student; do you recall?

9          THE WITNESS:  I don't recall, sir.

10         HEARING OFFICER McELLIGOTT:  That is the

11  only question I have for you.  Let me pose a question

12  to counsel.

13         To the extent that I excuse Ms. S██████,

14  is there anything else we need to cover with her

15  about programming at Wesley Spectrum?  In other

16  words, I don't want to bring her back -- let me say

17  it this way.  This is Ms. S██████ opportunity to

18  testify, so to the extent that there is anything else

19  to ask her, because right now, in terms of Ms.

20  S██████' testimony, the story ends in,

21  approximately, February of 2016, when the NOREP is

22  returned, at least in terms of the documentary

23  evidence.

24         So is there anything after that point that

25  we need to ask her, because this would be the

1                    P. ███████ - Recross

2      opportunity, so I want to make sure that there's

3      nothing that we need to cover with her while she is

4      here.

5              Ms. Haraldsen, is there anything that you

6      need to ask Ms. S███████ while she is here, beyond

7      February 2016?

8              MS. HARALDSEN:  No, Your Honor.

9              HEARING OFFICER McELLIGOTT:  Ms. Lane, is

10     there anything you need to ask Ms. S███████ beyond

11     that time?

12             MS. LANE:  No.

13             HEARING OFFICER McELLIGOTT:  With that, your

14     testimony has come to an end.  Thank you for your

15     participation and being with us here this morning.

16     We appreciate that, and you are excused.

17             (Short recess taken.)

18             HEARING OFFICER McELLIGOTT:  At,

19     approximately, 11:48 a.m., we are back on the record.

20     Everyone has had a chance to take a stretch and

21     comfort break, and we are ready for the next witness

22     to testify.  He is seated in the witness chair, and

23     we will have him sworn.

24             JEFFREY KATTAN, a witness herein, having

25     been first duly sworn, was examined and testified as

1              P. ███████ - Recross

2     follows:

3              HEARING OFFICER McELLIGOTT:  Sir, you have

4     introduced yourself to us, but now under oath, can

5     you please tell us your name?

6              THE WITNESS:  My name is Jeff Kattan,

7     K-A-T-T-A-N.  I am the Principal of Keystone Oaks

8     Middle School.

9              HEARING OFFICER McELLIGOTT:  By title, is

10    Mr. Kattan or Dr. Kattan appropriate?

11             THE WITNESS:  Mr. Kattan is fine.

12             HEARING OFFICER McELLIGOTT:  Mr. Kattan, you

13    were in attendance when I gave instructions before

14    Ms. S██████  testified; is that correct?

15             THE WITNESS:  Yes.

16             HEARING OFFICER McELLIGOTT:  Did you hear

17    those instructions?

18             THE WITNESS:  Yes.

19             HEARING OFFICER McELLIGOTT:  Would you like

20    me to repeat any or all of those instructions?

21             THE WITNESS:  No.

22             HEARING OFFICER McELLIGOTT:  Then call those

23    instructions to mind and bear them in mind as we

24    engage in this.  You have seen how it will unfold,

25    and have some sense of the instructions in light of

Page 124

**J. Kattan - Direct**

1

2  that, but please bear them in mind.

3          THE WITNESS:  Thank you.

4          HEARING OFFICER McELLIGOTT:  Does counsel

5  have a sense of who would like to lead questioning of

6  Mr. Kattan?

7          MS. MODELL:  I would like to lead.

8          HEARING OFFICER McELLIGOTT:  Will you lead

9  questioning, Ms. Modell?

10          MS. MODELL:  Yes.  I will lead questioning,

11  and I would like permission to question him as if on

12  cross.

13          HEARING OFFICER McELLIGOTT:  I don't have

14  any issues with that, request is granted.  Ms. Modell

15  will have questions for you first, and then we will

16  go to Ms. Lane to see if she has questions after

17  that.  We had allotted two hours for this witness, 60

18  minutes of questioning for each of you, and we will

19  see where that takes us after 60 minutes or so.

20          At 11:49, whenever you're ready, Ms. Modell.

21                  DIRECT EXAMINATION

22  BY MS. MODELL:

23      Q.   Good morning, Mr. Kattan.

24      A.   Good morning.

25      Q.   Could you please describe your educational

Page 125

1                    **J. Kattan - Direct**

2      history for us, briefly?

3          A.    Schooling, as well, or just professional?

4          Q.    Schooling and professional.

5          A.    So I originally graduated from Duquesne

6      University with a Bachelor's degree in physics.  I

7      went back to school and got a Master's degree to

8      teach seventh through twelfth physics.  I also went

9      back to school and received a Master's degree and

10     principal's certification.

11             My educational background includes eight

12     years of teaching physics.  It also includes nine

13     years as an assistant principal, and now I've just

14     concluded my fourth year as a principal.

15         Q.    When you did become familiar with ████████

16     ███████; do you recall?

17         A.    Initially, just from his enrollment into our

18     school.  I did not meet with him at that time.  I

19     introduced myself, as I try to do with most new

20     students.  I did not really have a lot of involvement

21     initially with him coming to our school in December

22     of 2013.

23         Q.    As principal, you are responsible for

24     disciplinary issues; is that correct?

25         A.    I am.