IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| J. S., a minor, by his Parent, P.S., and on his own behalf, | ) ) ) | |
|---|---|---|
| Plaintiff, | ) ) | Civil Action No. 18-1713 |
| v. | ) ) | |
| KEYSTONE OAKS SCHOOL DISTRICT, | ) ) ) | |
| Defendant. | | |

## MEMORANDUM OPINION

Plaintiff J.S. commenced this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). He seeks reversal of a Pennsylvania Due Process Hearing Officer's ("Hearing Officer") determination that the Keystone Oaks School District ("District") met its obligations to provide J.S. with free appropriate public education in the least restrictive environment.

Currently pending before the Court are the parties' fully briefed cross motions for summary judgment. (ECF Nos. 31 and 34.) Their concise statements of material facts and responses thereto are based on the administrative record. (ECF Nos. 33-1–11 ("Record").)[1] For the reasons stated herein, the Court will grant the District's motion and deny J.S.'s motion.

### I. PROCEDURAL HISTORY

J.S. and his mother requested a due process hearing before Pennsylvania's Office of Dispute Resolution after the District placed J.S. outside of the District. They contended that the

---

[1] In this opinion, the Court cites to the administrative record provided by the District because the one appended to J.S.'s motion (ECF No. 34-3–11) is incomplete.

District failed in its obligation to provide free appropriate public education ("FAPE") to J.S. in the least restrictive environment ("LRE") from March 2016 through March 2017. (R. at A.2.)[2]

At the hearing, the Hearing Officer reviewed documentary evidence provided by the parties and heard testimony from J.S.'s mother, the District's principal, J. Kattan ("Principal Kattan"), and the District's Special Education Supervisor, D. Burns. (*See id.* at A.27.) In a decision and order dated September 30, 2018, the Hearing Officer found in favor of the District. (*Id.* at A.1–A.25.) J.S. then commenced this action.

## II. FACTUAL BACKGROUND[3]

J.S. enrolled in the District as a seventh grader in December 2014. (R. at A.3.) Because he had previously received occupational therapy ("OT") services in fine motor skills, the District sought and received permission from his mother in February 2015 to evaluate those needs. (*Id.*) At around the same time, J.S.'s mathematics teacher contacted his mother about J.S.'s low performance and explained that other teachers were also concerned about J.S.'s performance. (*Id.* at A.3–A.4.) With his mother's consent, the District decided to conduct a comprehensive psychoeducational evaluation of J.S. (*Id.* at A.4.)

---

[2] Citations to the Record will be referred to as "R. at __."

[3] When a district court reviews an agency's decision under the IDEA, "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). The Court must defer to those factual findings "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Id.* Here, the parties do not challenge the Hearing Officer's underlying findings of fact. After reviewing the Record, the Court similarly finds no reason to depart from those findings. Accordingly, this summary is based on the Hearing Officer's undisputed factual findings which are supported by the Record. (R. at A.3–A.18.)

During the evaluation process, J.S. engaged in unwanted interactions and conversations with a female student on two separate occasions. (*Id.* at A.4–A.5.) With respect to the first instance, a teacher reported to a school counselor and Principal Kattan on March 26, 2015 that:

> I have witnessed [J.S.] talking to [the female student] and hanging around [her] desk and [she] has clearly asked [J.S.] to back away and to leave [her] alone. I spoke with [J.S] after class this morning and [he] told me that [he] is in love with [the female student] and [he] is frustrated with [her] not liking [him].

(*Id.* at A.5.) A school counselor spoke to J.S. about his behavior the same day. (*Id.*) The next day, a different counselor spoke to the female student to assure her that that J.S.'s behavior had been addressed and advised her to contact a school counselor if J.S. engaged in any further concerning behavior toward her. (*Id.*)

A few days later, on March 31, 2015, the same teacher sent an email to school counselors and Principal Kattan that:

> Today as class was concluding, I saw [J.S.] approach [the female student] and accuse [her] of not liking [him] (for a certain reason). I spoke with both students and informed both of them I would be emailing guidance and the principal. I have spoken with [J.S.] several times about how inappropriate these incidents are.

(*Id.*) In response, one of the school's counselors who was copied on the email told the teacher that she would discuss the matter with J.S.'s mother. (*Id.* at 6.)

In April 2015, the District issued J.S.'s evaluation report ("ER") which included input from J.S.'s teachers. (*Id.*) His teachers indicated that J.S had organization and task-completion difficulties, struggled academically in various classes, and was consistently weak in handwriting. (*Id.*) The ER also reflected a concern by J.S.'s teachers about his ability to progress adequately through the curriculum without modifications. (*Id.*) None of J.S.'s teachers reported any behavior or peer related issues in their classes. (*Id.*)

The ER included a cognitive assessment, achievement testing, and up-to-date grades and classroom performance information, but there were no social, emotional, or behavioral

3

assessments conducted. (*Id.* at 6–7.) Based on the discrepancies between his intellectual functioning and achievement assessments, coupled with concerns raised by his teachers, the ER recommended that J.S. be identified as a student with specific learning disabilities. (*Id.* at 7.)

In light of this recommendation, a meeting was scheduled for May 14, 2015, to craft an individualized education program ("IEP") for J.S. (*Id.* at 8.) Several days before that meeting, J.S. allegedly exposed his private parts to same-sex students in school, and Principal Kattan requested a meeting with his mother. (*Id.* at 7.) J.S.'s mother acknowledged that his behavior was unacceptable but indicated that she could not meet until the date of the IEP meeting. (*Id.* at 7–8.) J.S. was suspended for the two days leading up to the meeting. (*Id.* at 8.)

On May 14, 2015, the parties met and prepared an IEP ("May 2015 IEP") for J.S. which included five goals: two in reading comprehension, one in math problem-solving, one in organization/attention, and one in social interaction with peers. (*Id.* at 8.) The May 2015 IEP reflected that J.S. did not exhibit behavior that impeded his learning or that of others and that he would receive all instruction in the regular education setting. (*Id.*) His mother approved the May 2015 IEP and the recommended placement. (*Id.* at 9.) The IEP team also discussed J.S.'s potential involvement in the District's Student Assistance Program ("SAP") which provided support and counseling to students struggling with non-school issues and issues outside of academics. (*Id.*) The SAP team included District teachers, counselors, administrators, and non-District counselors. (*Id.*) At the meeting, J.S.'s mother received paperwork for consent to allow him to participate in that program. (*Id.*)

On May 26, 2015, J.S.'s mother sent an email to Principal Kattan in which she stated that the female student involved in the two incidents in March 2015 had said negative things to J.S. (*Id.*) His mother requested that the two not be in classes together. (*Id.*) Principal Kattan responded

4

that J.S. shared only homeroom and lunch with the female student. (*Id.*) He assured J.S.'s mother that J.S. would be reassigned to a new homeroom and that he would look into assigning seats at lunch as well. (*Id.* at 9–10.) In his e-mail, Principal Kattan also recounted a conversation he had with J.S. reflecting that J.S. may have a negative self-perception. (*Id.* at 10.) He shared that information with J.S.'s mother in the context of again requesting that she consider providing permission to allow the SAP team to become involved with J.S. (*Id.*)

J.S. returned to the District for eighth grade under the terms of the May 2015 IEP. (*Id.*) At the outset of the school year, in early September 2015, the District was engaged in coordinating social skills groups for all students, including J.S., who required such programming. (*Id.*) In mid-September 2015, the District was still hopeful that J.S. could be included in the SAP team process but did not have his mother's consent. (*Id.* at 10–11.) Failing to receive permission to allow J.S. to participate in the SAP, the District then requested that J.S. become involved in a regular education curricular effort about healthy relationships/interactions. (*Id.* at 11.)

On September 28, 2015, J.S. made inappropriate statements about the female student to a teacher and other students. (*Id.*) Principal Kattan discussed the situation with J.S. and warned him that any further such offenses would result in detention or suspension. (*Id.*) A few weeks later, J.S. surreptitiously destroyed the work of fellow students and was given detention. (*Id.*) The next school day, on October 19, 2015, J.S. received a three-day suspension for circling the female student's table in the school cafeteria during lunch. (*Id.* at 11–12.)

In an interview with Principal Kattan about the cafeteria incident, J.S. stated that "[i]f I cannot have [the female student], no one can have [her]." (*Id.* at 12.) During that interview, Principal Kattan asked J.S. how he would feel if, hypothetically, the female student became involved in a romantic relationship with another person. (*Id.*) J.S. responded that he would light

5

that person on fire with gasoline and matches, and that he would do the same to a future spouse should the female student marry in the future. (*Id.*) Principal Kattan described J.S.'s affect, during this interview, as "angry" except when speaking of the harm to others, where he described J.S.'s affect as "happy and (smiling)." (*Id.*) Principal Kattan contacted J.S.'s mother to tell her about these matters and recommended that J.S. be seen for a mental health assessment. (*Id.*) He also asked J.S.'s mother to share the results of that assessment with the District. (*Id.*)

On October 20, 2017, J.S.'s mother took him to a psychiatric clinic for an evaluation. J.S.'s psychiatric evaluation yielded a provisional diagnosis of an unspecified schizophrenia spectrum/other psychotic spectrum disorder. (*Id.*) A day or two after his psychiatric evaluation, J.S.'s mother informed Principal Kattan that J.S.'s provisional diagnosis was psychosis.[4] (*Id.*) J.S.'s psychiatric evaluation was not provided to the District. (*Id.* at 14.) The only information the provided to the District was his mother's statement about the diagnosis. (*Id.*)

On October 23, 2015, J.S. and his mother met with Principal Kattan, J.S.'s special education teacher, and a special education administrator. (*Id.*) The parties discussed J.S.'s increasingly problematic behaviors and potential placement in a partial hospitalization program to address his mental health needs. (*Id.*) At this meeting, J.S.'s mother consented to his participation in the SAP and the May 2015 IEP was revised to reflect her consent. (*Id.* at 14–15.) Following this meeting, the District contacted a private school, Wesley Spectrum, for J.S.'s potential enrollment

---

[4] At the administrative hearing, J.S.'s mother denied that J.S. had been so diagnosed. In contrast, Principal Kattan testified that J.S.'s mother told him that J.S. had been diagnosed with psychosis. Following the close of testimony, the Hearing Officer ordered that the documents related to J.S.'s psychiatric evaluation and subsequent services be produced and made part of the Record. Ultimately, the Hearing Officer credited Principal Kattan's testimony. The Court must afford the Hearing Officer's credibility determinations "special weight" and accept them "unless the nontestimonial, extrinsic evidence in the record would *justify* a contrary conclusion." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 n.4 (3d Cir. 2006). Here, J.S. has not pointed to any such evidence. Indeed, J.S.'s psychiatric evaluation records contradict his mother's testimony.

in its partial hospitalization program. (*Id.* at 15). J.S.'s mother did not immediately agree to his placement in a partial hospitalization program but was amenable to considering it and visited the program. (*Id.* at 14–15.)

On October 26, 2015, J.S. met the school's mental health therapist as part of the SAP. (*Id.* at 15.) The therapist noted that J.S. could not stop perseverating on the female student and kept on asking about her whereabouts and safety. (*Id.*) The same day, while in the special education classroom, J.S. refused to listen to instructions to stay seated and kept checking the hallway through the window of the classroom door. (*Id.*) Upon seeing the female student in the hallway, J.S. left the classroom to embrace her and would not let her go. (*Id.*) The District suspended J.S. for three days following this incident. (*Id.*)

On October 27, 2015, J.S. went for a follow-up appointment at the psychiatric clinic. (*Id.* at 16.) The clinic's treatment plan recommended partial hospitalization for J.S. (*Id.*) This was communicated to Principal Kattan. (*See id.* at A.422.) On November 2, 2015, the Wesley Spectrum Program[5] accepted J.S. (*Id.*) J.S.'s mother participated in the intake process on the same day. (*Id.* at 16.) On November 4, 2015, the District signed a contract to enroll J.S. at the Wesley Spectrum

---

[5] In his decision, the Hearing Officer refers to the program at Wesley Spectrum in which J.S. was placed as "the partial hospitalization program." However, the Record reflects that on October 28, 2015, Wesley Spectrum notified the District that, due to an issue with his insurance, J.S.'s medical assistance was inactive and therefore, he would not be eligible for its partial hospitalization program. (R. at A.420.) Thereafter, on November 2, 2015, Wesley Spectrum accepted J.S. into its approved private school program which was funded by the District. (*Id.* A.459–A.460.) Although J.S. was not placed at Wesley Spectrum's partial hospitalization program, the District's Special Education Supervisor Ms. Burns testified that
> [B]ecause the need for mental health services was still there . . . [the District] worked with Wesley Spectrum, and [Wesley Spectrum] offered that [J.S.] still continue to receive the services and support through the educational program, and he received the therapy and the intense services that the partial [hospitalization program] would offer.

(*Id.* at A.264.) The Court will refer to J.S.'s placement at Wesley Spectrum as the "Wesley Spectrum Program."

Program, with an enrollment date of November 6, 2015. (*Id.*). The District also issued a notice of recommended educational placement on November 4, 2015, and J.S. began to attend the Wesley Spectrum Program on November 6, 2015. (*Id.*)

In December 2015, the Wesley Spectrum Program designed an IEP for J.S. which indicated that J.S. exhibited behaviors that impeded his learning or that of others. (*Id.* at 17.) J.S. attended the Wesley Spectrum Program under the terms of the December 2015 IEP through December 2016. (*Id.* at 17–18.) In December 2016 a new IEP was designed for J.S. which was crafted for implementation at the District following J.S.'s gradual transition back to the District. (*Id.* at 18.) That transition began in January 2017 and by March 27, 2017, J.S. had fully transitioned back to the District. (*Id.*)

### III. STANDARD OF REVIEW

"Judicial review in IDEA cases differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995). In IDEA cases, district courts apply a modified version of de novo review. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012).

In applying the modified de novo review standard, "[a]lthough the District Court must make its own findings by a preponderance of the evidence, it is also required to afford due weight to the factual findings of the hearing officer." *Munir v. Pottsville Area Sch. Dist.*, 723 F.3d 423, 430 (3d Cir. 2013). Whether a school district fulfilled its FAPE obligations is a question of fact. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (quoting *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir.2009)). Under the "due weight" standard, such "[f]actual findings from the administrative proceedings are to be considered prima facie

correct. If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities." *Ridley*, 680 F.3d at 268 (quoting *S.H. v. State–Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)).

A hearing officer's conclusions of law are subject to plenary review. *D.K.*, 696 F.3d at 243. "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270.

## IV. DISCUSSION

J.S. advances the same argument that he pressed at the administrative level. He asserts that the District did not make any reasonable efforts to accommodate him in the regular classroom before placing him in a highly restrictive setting at the Wesley Spectrum Program. In making this argument, J.S. does not dispute the facts that formed the basis of the Hearing Officer's decision. Rather, he challenges the Hearing Officer's legal analysis. Specifically, J.S. contends that in finding that the District had provided J.S. with FAPE in the LRE, the Hearing Officer failed to properly analyze the District's decision-making process under the two-part test set forth in *Oberti v. Board of Education of Clementon Sch. Dist.*, 995 F. 2d 1204 (3d Cir. 1973).

J.S.'s argument that the Hearing Officer erred is based on the mainstreaming component of the IDEA, under which school districts must educate children with disabilities with nondisabled children to the "maximum extent appropriate."[6] 20 U.S.C. § 1412(a)(5)(A). The Third Circuit has

---

[6] The implementing regulations of Section 504 of the Rehabilitation Act contain a similar mandate. *See* 34 C.F.R. § 104.34(a) ("[School Districts] . . . shall educate, or shall provide for the education of, each qualified handicapped person . . . with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person."). The Third Circuit has explained that "a party may use the same conduct as the basis for claims under both the IDEA and the [Rehabilitation Act]." *Andrew M. v. Delaware Cty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). "[W]hen a state fails to provide a disabled child with a free and

9

"interpreted this mandate to require that a disabled child be placed in the . . . [LRE] that will provide him with a meaningful educational benefit." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). A LRE "is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Id.* at 578–79 (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995)).[7]

J.S. argues that the Hearing Officer did not even outline the *Oberti* two-prong test in the decision, let alone provide a proper analysis with respect to each prong.[8] He further maintains that the Hearing Officer relied upon irrelevant facts in finding no LRE violation. As the party seeking relief and challenging the Hearing Officer's conclusion, however, J.S. bears the burden of persuasion. He cannot meet his burden by merely arguing that the Hearing Officer failed to explicitly mention the *Oberti* test in his decision. Rather, the critical issue here is whether the Hearing Officer appropriately analyzed the relevant factors in reaching his decision. After a careful review of the Record, the Court finds that he did so.

---

appropriate education, it violates the IDEA. It also violates the [Rehabilitation Act] because it is denying a disabled child a guaranteed education merely because of the child's disability." *Id.* at 350.

[7] Similarly, in *Oberti*, the Third Circuit adopted a two-prong test for determining compliance with the LRE requirement. 995 F.2d at 1215. First, a court inquires "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily." *Id.* (internal quotation marks and citation omitted). If a court finds that the child cannot be satisfactorily educated in a regular classroom with supplementary aids and services, it turns to the second part of the *Oberti* test: "whether the school has mainstreamed the child to the maximum extent appropriate, i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* (internal quotation marks and citation omitted).

[8] While the Hearing Officer did cite to *Oberti* in his Decision (R. at A.19), J.S. is correct that he did not specifically reference the two-prong test.

In fact, the Hearing Officer considered both whether J.S.'s education could be achieved in a regular classroom and whether the District had mainstreamed J.S. to the maximum extent possible. Contrary to J.S.'s assertion that the Hearing Officer relied on irrelevant facts in finding that the LRE requirement was satisfied, he focused on highly pertinent facts in concluding that the J.S. placement at the Wesley Spectrum Program was appropriate. As the Hearing Officer noted:

> [J.S.'s] behavior and statements in the interview with [P]rincipal [Kattan], both on October 19, 2015, raised legitimate concerns that J.S.'s needs might be psychiatric as well as educational.
> The psychiatric evaluation the next day confirmed this, with a mental health diagnosis shared with the District. To address the mental health needs of [J.S.]—being exhibited in increasingly profound, and arguably dangerous, ways—[his] IEP team, with the cooperation of [J.S.'s mother], considered a partial hospitalization program on October 23, 2015. . .[His mother] granted permission for J.S.'s participation in the SAP program, and [J.S.] remained at the District.
> The next school day, October 26, 2015, in work with the SAP counselor, [J.S.] was again exhibiting the focus on [the female] student [] which was the concern of the mental health professionals and were the window into the psychiatric diagnosis. That day, [J.S.] defied directives, left a classroom, and made unwelcomed physical contact with [the female] student. On the following day, October 27, 2015, a mental health professional recommended a partial hospitalization program. This aligned with the IEP team's deliberations of a few days prior. On November 2, 2015, the intake process, in cooperation with [J.S.'s] mother, was completed and by November 6, 2015, [J.S.] was participating in the [Wesley Spectrum Program] under the terms of an IEP.

(R. at A.22–A.23.)

These facts, which are supported by the Record, support a finding that at the time of his placement, J.S. could not receive an appropriate education in an environment less restrictive than the Wesley Spectrum Program. The Court agrees with the Hearing Officer's conclusion that "[t]o characterize this as a unilateral special education placement decision is erroneous" because "[J.S.'s] IEP team, including [J.S.'s mother], were grappling with fast-developing information where non-educational mental health needs had become the clear and, at the time, pre-eminent concern for [J.S.]." (*Id.* at A.22.) After reviewing all of the facts, he found that J.S.'s placement in the Wesley Spectrum Program was based upon intervening, critical mental health concerns for J.S

which escalated so quickly that his mental health needs were greater than what the District mental health therapist could support. The Hearing Officer properly framed the issue before him as "whether the District inappropriately moved to deliver [J.S.'s] IEP in [the Wesley Spectrum Program.]" (*Id.* at A.23.) He recognized that J.S.'s claim was "not rooted in programming/services/progress [under an IEP,] as much as a placement claim regarding the LRE. (*Id.* at A.24.)

Therefore, the record supports the need to place J.S. in the most appropriate environment to receive a meaningful educational benefit after the District learned of his diagnosis and otherwise observed his behavior, including his comments and affect while meeting with Principal Kattan. Moreover, the IEP later developed by Wesley Spectrum noted that J.S.'s behaviors impeded his learning or that of others. Thus, while J.S. attended the Wesley Spectrum Program, it was appropriate that he would not be included in programs at the District with nondisabled children so that he would not be a danger to himself or others. During this time, he was able to receive not only an educational program, but also the "the therapy and the intense services" that were required at the time given his diagnosis and behavioral issues. (*Id.* at A.264.) Because J.S. has not explained how the District could have mainstreamed him any further under these circumstances, he has failed to meet his burden on this claim.

Finally, J.S. also argues that the Hearing Officer improperly considered J.S.'s mental health records in reaching his decision because these records were not available to the District at the time of its placement decision. The Hearing Officer's decision to supplement the Record with these mental health records, however, was necessary to resolve a material issue of disputed fact: whether J.S. had been diagnosed with psychosis and whether J.S.'s mother shared that diagnosis with the District. J.S.'s mental health records were relevant to resolve this disputed fact, and therefore,

appropriately considered. Moreover, even without reference to these records, there is more than sufficient information in the record to support the conclusion that the District met its obligation to provide free appropriate public education to J.S. in the least restrictive environment.

In sum, after reviewing the Record, the Hearing Officer's decision, and the parties' briefing, the Court finds no error in the Hearing Officer's analysis. The Hearing Officer applied the correct legal standard, properly considered the Record, and ultimately reached a decision that is supported by the facts and the law, i.e., that the District did not deny J.S. free appropriate public education in the least restrictive environment by placing him at the Wesley Spectrum Program. Therefore, the District's motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied.

Appropriate orders will follow.

Dated: March 31, 2020          BY THE COURT:

_____
Patricia L. Dodge
United States Magistrate Judge